Filed 9/9/21  P. v. Brown CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> SHAWN LAMONT BROWN et al., <br><br> Defendants and Appellants. | F077143 <br><br> (Super. Ct. No. F15904751) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Robert J. Beles, Joseph L. Ryan, Cliff Gardner and Brooke N. Acevedo, for Defendant and Appellant Shawn Lamont Brown.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant Lachance Larue Thomas.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendants Shawn Lamont Brown and LaChance Larue Thomas stand convicted of first degree willful, deliberate and premeditated murder of Von Randell Correia, Jr. (the victim) (Pen. Code, §§ 187, subd. (a), 189, subd. (a)).[1] The jury found true special allegations that Brown proximately caused the victim's death by personally and intentionally discharging a firearm within the meaning of section 12022.53, subdivision (d) (section 12022.53(d) or § 12022.53(d)); that Brown personally used a firearm during the commission of the offense within the meaning of section 12022.5, subdivision (a) (section 12022.5(a) or § 12022.5(a)); and that, as to Thomas, a principal was armed with a firearm during the commission of the offense within the meaning of section 12022, subdivision (a)(1) (section 12022(a)(1) or § 12022(a)(1)).

Brown was sentenced to 25 years to life for the first degree murder conviction (§ 190, subd. (a)), and a consecutive 25-year-to-life term for personally and intentionally discharging a firearm under section 12022.53(d).[2] Thomas was sentenced to 25 years to life for the first degree murder conviction, and a one-year term was imposed for the firearm enhancement under section 12022(a)(1).

On appeal, defendants assert their first degree murder convictions lack the support of substantial evidence in two respects: there was no substantial evidence of any intent to kill under a direct or transferred intent theory and the jury should not have been instructed on transferred intent; and there was no substantial evidence of deliberation and premeditation. We reject these arguments and find the verdicts of first degree murder as to Brown and Thomas were supported by substantial evidence.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The enhancement found true under section 12022.5(a) was stricken pursuant to section 12022.53, subdivision (f).

Defendants also claim the court erroneously admitted hearsay from an investigator and a copy from text messages on a cellphone. Brown additionally argues irrelevant testimony of one of the witnesses was erroneously and prejudicially admitted. We conclude that, even if some of this evidence was erroneously admitted, considered individually or cumulatively, it did not result in any violation of defendants' federal constitutional rights nor was it prejudicial.

Defendants argue the court failed to instruct on the lesser included offense of involuntary manslaughter, and the trial court violated their constitutional rights by instructing the jury to consider a witness's certainty to assess the accuracy of their identification testimony under CALCRIM No. 315. Brown separately argues the court violated his constitutional rights by instructing the jury it could consider Brown's out-of-court statements alone to prove his identity as the person who committed the crime under CALCRIM No. 359. We reject these arguments. There was no substantial evidence to support an instruction on involuntary manslaughter. Further, beside that the other instructional claims were forfeited, pursuant to *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), the trial court did not violate defendants' constitutional rights by instructing the jury to consider the witness's certainty as one factor in considering their identification testimony under CALCRIM No. 315, nor did the trial court violate Brown's constitutional rights by instructing the jury how to consider Brown's out-of-court statements under CALCRIM No. 359.

Finally, we agree with defendants that their obligation to pay victim restitution must be joint and several, and we agree with the People that Brown's abstract of judgment must also be amended to reflect the correct amount of victim restitution ordered by the court. Thomas and the People agree, and we concur, that Thomas's abstracts of judgment incorrectly list twice the court's imposition of fines and fees. As a result, the determinate abstract of judgment as to Thomas issued on Judicial Council Forms, form CR-292 shall be stricken, and the indeterminate abstract of judgment as to Thomas

3.

issued on Judicial Council Forms, form CR-290, must be amended to include the one-year firearm enhancement imposed under section 12022(a)(1).

Aside from the modification of the victim restitution obligation to joint and several and the modifications to the abstracts of judgment, *ante*, we otherwise affirm the judgments.

**FACTUAL SUMMARY**

Just after midnight on July 28, 2015, police responded to a report of shots fired at the Ashwood Garden apartment complex in Fresno. At the scene, officers discovered an unconscious man bleeding and lying on the ground on the north and east side of the apartment complex. It appeared he was shot, and he was transported to the hospital where he died from a gunshot wound in his back that perforated his heart and one of his lungs. Upon autopsy, the death was ruled a homicide.

## I. Prosecution Case

### A. The Shooting and Arrest of Defendants

On the evening of July 27, 2015, Torrie McGee made arrangements with Thomas, someone she had dated, to pick him up where he was and take him to his home. McGee drove to Thomas's location at an apartment near the intersection of First Street and McKinley Avenue (First and McKinley). She texted Thomas at 10:21 p.m. that she was on her way. At 10:28 p.m., she texted Thomas that he should come outside. Thomas came out of the apartment building with Brown, who McGee knew also went by the name Bsmash. She had met Brown before, but she had not expected Thomas to have anyone with him. When they got in the car, Thomas got in the front seat and Brown got in one of the back seats. Thomas told McGee they were going to the Ranchwood apartments, which is a complex on the east side of Fresno. McGee drove straight there, making no stops.

At Ranchwood, Thomas and Brown exited the car, leaving McGee to wait inside the car for their return. Thomas and Brown walked to some apartment and were only

4.

gone for a few minutes before they returned to the car. Thomas directed McGee to go back to First and McKinley where she had originally met them. McGee drove them back to First and McKinley, but once there she parked on a different street from where she had picked them up. When she parked, they all sat in the car for a while and Brown made a call from his cell phone. McGee could not hear who was on the other end of Brown's call, but McGee assumed it was a female. Brown was telling the person on the phone that he wanted that person to call someone else and for that someone else to go to a location on First and McKinley. Brown told the person on the phone to act like they were drunk and having a party. McGee heard Brown say the word McLane, which she believed was just a street away from First and McKinley.

Brown's conversation made McGee feel "[w]eird." She did not understand why he would be telling people to come over and act like they were drunk and having a party. She began texting a friend during Brown's conversation. She texted the friend at 11:07 p.m. that "'[t]hey'" were doing "'weird ass shit'" and that "'[t]hey're having bitches set up motherfuckers up and shit ....'" She texted she did not "'want to be involved in no weird ass shit, for real, for real.'" The phone call made her scared and nervous. At 11:15 p.m., the friend sent McGee a text saying, "'Oh wow, come home,'" and McGee responded, "'No, I'm scared to say something to him,'" referring to Thomas. McGee was afraid it was going to "blow up into something bigger, or even be an argument" if she said anything to Thomas about the call.[3]

After Brown's phone conversation ended, Thomas and Brown got out and had a conversation outside behind the car, which McGee could not hear. When they were done talking, they got back into the car, and McGee drove them back to where she had picked them up originally. Brown went into an apartment building to charge his phone; McGee

---

[3] The jury was instructed McGee's testimony concerning Brown's phone conversation could not be used against Thomas. The jury was also instructed McGee's fear of Thomas was not to be used as evidence of Thomas's character.

had no idea how long Brown was in the apartment building. McGee told Thomas she needed to go home, so Thomas called or texted Brown to come back to the car. Thomas asked Brown if Brown was going to stay with Thomas, and Brown said yes. Thomas then directed McGee to drive them to the intersection of Shields and Maple. McGee thought she was taking them to the Sycamore apartment complex, which is near that intersection—Thomas visited the Sycamore frequently and McGee thought he had a friend at that building that Brown knew too.

However, when they arrived at the Shields and Maple intersection, Thomas told her to go across the street to a different apartment complex—the Ashwood apartments— and to pull into the parking lot and park. McGee made a U-turn on Shields and proceeded to a parking lot in the Ashwood complex. McGee backed into a parking spot and Thomas said he and Brown would be right back. McGee did not remember telling an officer it was Thomas who told her to back into the spot. McGee stayed in the car and listened to music with the windows up. After they got out of the car, McGee heard gunshots. She did not remember how long they were out of the car before she heard the shots–she estimated it was probably less than two minutes. After she heard the gunshots, Brown and Thomas came back to the car about one minute later. She thought they were acting "[n]ormal," although she remembered telling an investigator later they were out of breath. McGee asked Thomas where they were going and he directed her to get on the nearby State Route 168 (Highway 168). She did not ask them what had happened, and she denied telling an officer that she did not ask Thomas because she was scared of him—she just never had a chance to ask him anything.

A police car pulled McGee's car over at the on-ramp to Highway 168. She thought she might have asked what was going on, and Thomas said to calm down. She denied seeing anything thrown out of the car windows between leaving Ashwood and being pulled over on the on-ramp. She did not know whether she had any gloves in the car at that time—she had a lot of stuff in her car.

6.

She learned later Thomas and Brown were arrested for their involvement in this incident, and they were released from jail a few days later. After his release, Thomas called her and said something to her about talking to people she was not supposed to be talking to—she assumed he meant the police. He said he would see her soon and hung up the phone, which she interpreted as a threat. This call occurred a few days before he was arrested again. She admitted she first denied hearing any gunshots when she was at Ashwood with Thomas and Brown—she was scared Thomas and Brown would do something to her if she talked to the police about what had happened.

On cross-examination, McGee testified her discomfort with Brown's cell phone conversation was related to events she thought were going to occur at First and McKinley. She did not believe anything Brown was discussing had anything to do with either the Sycamore or the Ashwood apartments. Nothing had led her to believe any type of setup was going to occur at the Ashwood apartments. She testified that at no point during the entire evening had she ever seen either Thomas or Brown with a gun. She denied knowing the victim or having ever seen him before, except perhaps on social media. McGee testified she had never seen Thomas with the victim, nor had Thomas mentioned having any type of problem with the victim.

Around midnight, three people were outside at the Ashwood apartments near the common area outdoor courtyard. Jennifer was smoking with another woman, Shawna, and Shawna's 13-year-old daughter (S.L.) was also with them. Jennifer was sitting with her back to Shields Avenue (Shields) and was facing the parking lot area. She saw a silver Dodge Charger drive past the apartment complex in a west to east direction, and then came back in an east to west direction. She heard a car pull into the lot and then heard at least one car door close. Right after this, she saw two people at a distance of about 38 feet. One man wore a dark top with a hood (a hoodie) that was pulled up and dark pants or jeans. Jennifer could see dreadlocks under the hood, and she noticed the hood was pointed up like there was hair stuffed into it. She estimated the hooded man

was about 5 feet 5 or 6 inches tall; she did not remember telling police she thought he was about 5 feet 9 inches tall.  She thought he was thinner and shorter than the second man, and she had described him to police as a Black man in his early 20's.

The second man Jennifer saw was also Black and he was wearing a white T-shirt—he was taller and larger than the first man; she estimated he was between 5 feet 10 inches to 6 feet tall.  He also had dreadlocks with lighter tips.  He stood about a foot behind the hooded man.  The two men stood in her view for "a minute or so" and appeared to speak to each other, although she could not hear what was said.  Then, the hooded man looked over at Jennifer, Shawna and S.L., and he walked forward toward the courtyard area.  The man in the white T-shirt disappeared and seemed to walk back to the carport area, but she lost sight of him.  She never saw the man in the whiteTt-shirt again at the complex.

The hooded man walked forward into the courtyard out of her sight—he was obscured by some bushes.  Seconds later, Jennifer heard someone say, "'You got any trees?'" but she could not tell who said it—it came from the direction where the hooded man had gone.  The voice of the person asking the question sounded male and his voice was raised as though he were yelling the question.  She also heard the voice ask, "'Do you have them on you?'"  She also testified she heard the voice ask, "'Are you holding?'"  After these questions, she heard five or six gunshots that were coming from the direction where the hooded man had walked.  The hooded man suddenly appeared again, backing up.  He made a movement with his right hand, which looked strange to Jennifer as though he was putting something in his pocket, and then he turned around, looked toward Jennifer again, and took off at a jog toward the parking area.  She thought perhaps he had been shot by the way he was turning and bending his head down, but she could not tell.  She could not see his hands—they were in his pockets or covered by his shirt, and she never saw a gun.  She did not remember telling a detective the hooded man had his hands at his waist trying to remove something before the shooting.

8.

Jennifer heard the sound of a car—although she never saw it pull into the parking lot or leave before or after the shooting. From her vantage point, the view of the parking lots on the east and west sides were obscured by buildings—she could see only a portion of Shields, the road that runs in front of the complex to the south. She thought she had seen a silver-colored car slowing down on Shields before the shooting, but she had not seen the car turn into the complex's parking lot. She heard only what sounded like a car that seemed to let people out and then had to turn around because the parking lot has only one exit and entrance. After the shooting, she heard car doors close and sounds of the car pulling away.

Immediately after the shooting and hearing the car doors slam, Jennifer ran into the house to check on a woman she provided care to because that woman was calling out, given the sounds of the gunshots. Shawna and S.L. followed her into the apartment, but Shawna and S.L. went through the apartment and out the front door while Jennifer attended to the person for whom she was providing care in the apartment.

Shawna testified that around midnight on July 27 to 28, 2015, she was sitting outside with Jennifer and her daughter, S.L. As they were sitting there, she saw one man come into view about 30 feet away from her. He appeared to be a 22- to 24-year-old Black man, 5 feet 6 to 5 feet 8 inches tall, and about 140 pounds. He was wearing a hooded sweatshirt or jacket with a front pocket and jeans; the hood was covering his head, and the hood was puffy, like something was in it—she believed it was the man's dreadlocked hair.

He was walking toward the laundry room and she lost sight of him. To her, he seemed to be walking unusually, like he had something in his jacket. She could not see his hands, he had them in his jacket. She was able to see him talking and she heard him ask someone who seemed to be a little distance away, "'Do you have any trees?'" She assumed the other person she could not see said yes because she then heard him ask "'Do you have them on you?'" As soon as she heard those words, she heard gunshots. She

9.

never saw a gun and she had lost view of the person in the hood at the time of the shots. After the gunshots, she saw the hooded man running back to the west parking lot. It looked like he was carrying or hiding something. She lost sight of him when he went back to the parking lot.

Shawna and S.L. then ran to the front of the building where she knew the car had to exit, and Shawna saw the hooded man in a car with a second individual. She saw the hooded man get into a car, and saw another individual driving the car. The driver looked like a larger Black man, but she could not really see what he looked like—she thought he had on a white T-shirt, but she really could not describe what he was wearing. On cross-examination, she could not recall whether the driver was wearing a white T-shirt.

She saw the car turn west out of the parking lot toward the highway. The car appeared to be a silver or gold Dodge Charger. Shawna saw a police officer in a patrol car on Shields shortly after—the officer was parked there. Shawna and S.L. told the officer that the killer was getting away in that car. The officer took off after the car. Shawna and S.L. then walked around the complex to see if anyone had been shot. They located a person facedown at the back of the complex. She and her daughter were the first people there, but shortly after that, three men joined them. Shawna recognized the victim as someone she had seen at the complex before—he would visit two brothers who lived there. The three other men included the two brothers that the victim would visit and another man. They were talking to each other saying, "I thought it was you." S.L. called 911, and Shawna and S.L. waited until the police arrived.

Shawna testified that a couple of weeks before the shooting she had had seen the Dodge Charger driven by the man in the white T-shirt. She did not remember seeing the man outside of the car.

On cross-examination, Shawna could not recall whether she had identified one of the brothers the victim would visit as the shooter to the district attorney's (D.A.) investigator, nor did she recall telling the investigator one of them might have been the

10.

shooter.  She had, however, told the D.A.'s investigator that the two brothers the victim would visit had come to her door after the shooting and asked her what she was telling the police.  She told the investigator she had seen one of them staring at her apartment, which made her feel a bit uneasy.  The brothers were young, Black men in their 20's; they also had dreadlocks.  To her, the brothers looked like the driver and the man in the hood from the night of the shooting.

S.L., who was 13 years old at the time of the shooting and 15 years old at the time of trial, testified she was visiting her mother, Shawna, at the complex the night of the shooting.  Jennifer, Shawna, and S.L. were outside around midnight—Jennifer was smoking, and S.L. was on her phone watching videos.  S.L. saw two people come into the complex—the first one was dressed in a black hoodie with the hood pulled over his head, but she could only see the side of his face at first.  This man was Black and she described him as skinny and about 5 feet 8 inches tall.  The second person was in a white T-shirt; he was not as skinny as the man in the hood and he was a little taller.  She saw the man in the white T-shirt peering out from behind a wall.  The man in the hoodie was looking straight ahead, and then he looked back at the man behind him in the white T-shirt.  S.L. could hear that there were people by the laundry room.

S.L. explained that about five minutes before the gunshots, she had seen the victim by the laundry room.  She did not know him well, but he had brought them movies in the past.  Before the shooting, she heard the victim talking to other people—there was more than one voice coming from the direction of the laundry room—but she never saw anyone other than the victim.  She did not recognize any of the other voices, but she heard the victim's voice and at least one other person near the laundry room.

She heard the man in the hoodie ask, "'You got any tree[s]?'"  He also asked something like "'Are you holding?'"  A few seconds after the man asked these questions, S.L. heard gunshots.  She saw the side of the hooded man's body jump as though surprised.  She described the hooded man's reaction to the shots as though it scared him,

11.

"like it wasn't supposed to go off that much." She had looked up when the hooded man started talking, and then she looked back down. She did not look back up until after about two shots were fired. There was nothing obstructing her view of the shooter, but she saw no muzzle flash. S.L. never saw a gun and she could not see the hooded man's hands—his back was to her.

After the gunshots, the hooded man turned around and went back in the direction of the west parking lot, and S.L. heard car doors. S.L. got up and went to the front gate and saw a silver car pull away. There happened to be a police officer parked on Shields in front of the apartment complex. Shawna and S.L. told the officer about the gunshots, and the officer went after the car. S.L. could not see how many people were in the car when it pulled out; she believed the windows were darkly tinted.

Shawna and S.L. found the victim with three other men around him. They were trying to call 911 and were asking the victim if he was okay. After police arrived on the scene, Shawna and S.L. went back to their apartment.

S.L. acknowledged during her trial testimony that when she was interviewed by police that night, she never told them she saw the man in the white T-shirt, and that she did not identify the man in the white T-shirt during the infield showup. She explained that when officers were questioning her, she was trying to decide for herself, but her mother kept giving her input and that was making her nervous. She did not want to give the wrong answer, and she did not want to seem as though she were lying by contradicting what her mother saw—so she just said she had not seen the man in the white T-shirt. At trial, however, her testimony was that the person in the white T-shirt she was shown at the police station was the man in the white T-shirt she had seen at the complex on the night of the shooting.

Officer Dominique Comeyne was working patrol on July 28, 2015, just after midnight. She had been dispatched to the Sycamore apartment building on Shields. She parked in front of the Sycamore apartments, which is located just to the south and across

12.

Shields from the Ashwood apartments; from her car she heard four to seven shots fired around 12:15 a.m. The shots sounded as if they were fired north of her, but were very close. Comeyne advised dispatch of the shots fired and requested additional units. She drove east on Shields, made a U-turn in front of the Ashwood apartments, and parked facing west on Shields. She started to exit her vehicle, but saw two females walking toward her. Comeyne also observed a four-door silver vehicle exiting the west side of the Ashwood complex.

Comeyne asked the females if the silver car was involved with the shots fired, and they confirmed it was. She advised dispatch and then pursued the silver vehicle, which was headed west on Shields. The vehicle took the on-ramp to Highway 168; Comeyne lost sight of it for approximately three seconds when the car went down the ramp. She never saw any objects, including a gun, come out of the vehicle while she was pursuing it.

Comeyne performed a felony traffic stop of the silver car on the on-ramp. When additional police units arrived, the occupants of the silver vehicle were held at gunpoint and directed to exit the vehicle. McGee was the driver, Thomas exited the front passenger side of the car wearing a white T-shirt, jeans, and a black baseball hat; and Brown exited from the right rear passenger door wearing jeans, a blue shirt, and a hooded sweatshirt. McGee consented to a search of the vehicle, but no weapons were found inside.

Later, after an infield identification by witnesses, Comeyne escorted Brown. As he was walking with Comeyne, he asked her whether it was "'a positive I.D." and "'Those were the witnesses?'" Comeyne did not answer his first question, and in response to his second question she explained to him she would have to talk to the detectives.

Officer Jeffery Lee was dispatched to the on-ramp to assist with Comeyne's felony stop of the silver car. After the occupants of the silver car were safely removed, he began

13.

walking up the on-ramp from the silver car toward Shields to see if anything had been discarded prior to the stop. He found a firearm on the pavement of the on-ramp approximately 100 yards north of Shields. The slide of the gun was locked back, the magazine was attached, but there was no ammunition in it. In his experience, a slide in the locked-back position indicates the weapon had been fired until no ammunition remained.

## B. Investigation

Lead detective Bartlett Ledbetter arrived at the Ashwood apartments crime scene at about 2:50 a.m. He also walked through the on-ramp crime scene, where he saw a divot in the ground several feet above where the gun came to rest. The divot looked fresh to him and had some very sharp corners. The silver car stopped on the on-ramp was not searched other than the initial search consented to by McGee and performed at the time of the stop—he ordered it towed and sent to an impound lot for a search after a warrant was obtained. No drugs were found in the suspect vehicle or any of the victim's belongings. There was no indication anything had been stolen from the victim.

### 1. Witness Interviews

Back at the Ashwood apartment complex, Ledbetter recorded an interview with each of the witnesses. His interview with Jennifer occurred at about 4:30 a.m. She indicated two men had been at the complex at the time of the shooting. One had the hood of his shirt up, and it looked as though his hair might have been stuffed in it. She described the hooded man as being a Black male around 5 feet 9 inches tall, about 140 pounds, and in his early 20's. She told Ledbetter the second individual was a Black male in a white T-shirt and jeans with long dreadlocked hair—the second individual was bigger, taller and just a bit older than the hooded man—the second man stood approximately 5 feet10 inches to 6 feet tall.

Part of Ledbetter's recorded interview of Jennifer was played for the jury. In that interview, Jennifer stated she did not see anyone shoot; one man was wearing a hoodie,

14.

but she could not see his face; she may have seen the man in the white T-shirt at the apartment before; and she said she would not be able to recognize the face of the man in the hoodie.

Ledbetter next interviewed Shawna. She provided a description of a suspect who was thin with a blue jacket and a hood. She also said his hood was puffy and pointed, but she never saw the suspect's hair. She also saw a vehicle leaving the west parking lot, but she did not see the driver.

A portion of Ledbetter's recorded interview with Shawna was played for the jury. Shawna told Ledbetter she had seen the Dodge Charger around the complex before. She thought there might have been someone with the person she had seen in the hood, but she "didn't see anyone, really." She did not get a "super good look" at the man in the hood; she lost sight of him after he asked questions and then a few seconds later she heard shots fired. She thought there had to be a second person because someone had to be driving the car. She described the car as a two-door vehicle, and she told Ledbetter she could not see who was in the car or how many people there were.

Ledbetter then interviewed S.L., who had been sleeping just prior to the interview. The individual S.L. saw was a Black male wearing a black sweatshirt with a hood and jeans. She described him as thin. Neither Shawna nor S.L. said they saw a person wearing a white T-shirt. Shawna was present for S.L.'s interview; Shawna interjected one time and Ledbetter told her to be quiet. Shawna said at one point in the interview she was happy law enforcement had gone after the car coming out of the complex.

### 2. Witness Identifications

After their separate interviews at the apartments, Jennifer, Shawna and S.L. were all transported to the police station so that an infield showup of the suspects could be conducted—this happened about 5:30 a.m. Jennifer was shown Thomas first. She said she recognized him by his face and his white T-shirt. She described him as the one hanging back at the apartment complex that night. Jennifer also identified Brown. She

15.

was very sure this was the person she had seen in the hood after she asked that his hood be put up during the identification.

Ledbetter testified Shawna was hesitant as to identifying Brown, but she said she recognized him as the man she had seen. Shawna thought the jacket Brown was wearing did not look like the jacket she had seen on the hooded man. As to Thomas, she thought he looked familiar, as though she had seen him before, but she could not make a positive identification. She did not recognize Thomas as anyone she had seen that night.

S.L. identified Brown as the person she saw in the hood, but when she viewed Thomas she said she had not seen him that night although he looked familiar to her.

The witnesses also participated in a field showup to identify the car they had seen. Jennifer testified the car she was shown at the on-ramp was the car she had seen on Shields before the shooting; viewing photographs from the witness stand, she identified the car in the photos as the car she had seen that night. Shawna and S.L. were together when they looked at the suspect vehicle on the on-ramp. They disagreed about whether that vehicle was the one they had seen at the apartment complex. S.L. told Ledbetter it was not the vehicle, but Shawna said there was no doubt it was the same car. To S.L. the headlights of the car on the on-ramp looked different and the windows were not tinted, although it was the same color and size as the car she had seen. On redirect, S.L. acknowledged the car on the on-ramp had its windows rolled down.

### 3. Interview with McGee

Ledbetter testified about his three interviews with McGee, which occurred on July 28, 2015, August 6, 2015, and on February 14, 2017. In the first interview, McGee told Ledbetter she had received a call and went to the Ashwood apartments on Shields to pick up Thomas and Brown, and they were stopped by the police immediately after that. Then, she changed her story. She said she had originally picked them up at First and McKinley and drove them to various locations. She denied hearing any gunshots when parked at the Ashwood apartments but later acknowledged she had heard gunshots. She

16.

told Ledbetter that when she pulled into the Ashwood apartment parking lot, Thomas told her to back into a parking space. She said she thought it was weird they were going to that particular apartment complex because she thought they were going across the street to the Sycamore complex—she did not think Thomas knew anyone at the Ashwood apartments.

She also told Ledbetter it was only 30 seconds after the gunshots that Brown and Thomas came back to her car. She told Ledbetter that Thomas would not let her speak with Brown because he did not like her talking with his friends. She said she was afraid of Thomas; she had seen him hit a girl before and he had done something to McGee once, too.[4]

### 4. Evidence Collected on the On-ramp

A crime scene technician was dispatched to the on-ramp at Shields on July 28, 2015, and he documented the scene photographically. He also took photos of the firearm Officer Lee had discovered, which was unloaded. There were five cell phones discovered in the vehicle. The gun was found 565 feet south of the silver car—the distance from Shields to the silver car was just over 1,000 feet. A divot was also found in the dirt along the on-ramp near the gun, although it was not conclusively made by the gun; the divot could have been there before the stop. The technician also collected samples from Brown, Thomas and McGee to test for gunshot residue (GSR).

### 5. Evidence Collected at the Apartment Complex

The Ashwood apartment buildings are situated around a pool and outdoor courtyard areas. There are two parking lots—one to the east and one to the west of the complex that extend north from Shields; each lot has a single entrance/exit onto Shields. There are carports along the outer edge of the parking lots. Shields runs east to west on the south side of the complex.

---

[4] McGee testified Thomas had pulled her hair once.

17.

In the middle of the complex, outside between buildings, there are two grassy courtyards to the north and south of a pool. On the south courtyard officers, located six .38-caliber shell casings, some clothing, flip-flop shoes, and bullet strikes on the exterior wall and interior of the nearby laundry room. The bullet casings were found to the west of the laundry room. The bullet strikes along the west-facing wall of the laundry room and the laundry room door measured from around 28 to 52 inches off the ground. Of the four bullet holes in the laundry room, three bullets were recovered; one of the bullets penetrated a dryer inside the laundry room and was not recovered. A deformed copper-jacketed bullet was found in the east parking lot. A secondary crime scene was also located at the north end of the complex toward the easterly located buildings. This is where officers located the victim, blood, a shoe, and a cell phone. An investigating officer testified it was 79 degrees at 11:53 p.m. on the night of the shooting, and the lighting was relatively good as he could identify faces at 50 to 60 feet.

### 6. Evidence Collected From the Car After Impound

On July 31, 2015, after the suspect vehicle was photographed and searched at a secured impound lot, black knit gloves were found on the floorboard of the rear right passenger compartment. Three cell phones were located in the center console. GSR swabs were taken from the door handles and seatbelts, and the gloves were preserved in a refrigerator for DNA testing.

### 7. GSR, Fingerprints and DNA

Kaitlin Bauer, a criminologist, testified that GSR is made of microscopic particles that are formed when a gun is fired; GSR has three main parts—lead, barium and antimony. The particles can be found in two-component parts, rather than three—although two-component particle combinations are not themselves GSR but they will, when found with three-component particles, help to establish that GSR is present.

Generally, someone within three to five feet of a fired weapon will have GSR on them. Those GSR particles will start to diminish after about four to six hours. The

18.

presence of more than three GSR particles is indicative of being near a weapon when it is fired. However, three or fewer GSR particles is considered a low-level sample, and it is difficult to exclude environmental transfer as the source of that number of particles. When a sample has more than three particles, environmental transfer is much less likely to be the source of the GSR.

GSR samples were acquired from the hands of Thomas, Brown and McGee; each were analyzed, and the gloves found in the back, right side of the car were also tested and analyzed. The sample from Brown's left hand contained only one 3-part component particle, and his right hand contained one 2-part component particle. Bauer concluded GSR was present, but at a very low level.

Thomas's right hand had four 3-component particles; his left hand had three 3-component GSR particles and two 2-component supportive particles. GSR was therefore present on his hands, environmental contamination was less of a concern, and the sample indicated Thomas had some sort of interaction with GSR recently—i.e., he fired a firearm or was in the vicinity of one being fired.

McGee had one 3-part component particle on her right hand, and nothing on her left. GSR was therefore present, but one particle is a very low-level sample and could have come from an environmental source.

The gloves found in the car were tested for GSR. The right glove contained fourteen 3-component GSR particles and six 2-component particles. On the left glove, there were seventeen 3-component GSR particles, as well as nine 2-part component particles. Bauer explained GSR can get onto gloves by an individual firing a weapon while wearing the gloves, being near a weapon that is fired while wearing the gloves, or coming into some sort of contact with a surface or individual with GSR while wearing the gloves.

On cross-examination, Bauer acknowledged GSR can be transferred from police contact if the officer has fired their service weapon recently. It can also be transferred from handling ammunition.

A latent print analyst, Vincente Guerreo, testified fingerprints were found on the gun, but they lacked clarity and the results were inconclusive and could not be positively matched to Thomas or Brown. Brooke Dorval, a supervisor with the crime scene section for the police department, testified there were no fingerprints recovered from the gun magazine or the bullet casings found at the apartment complex.

Buccal swabs were obtained from Thomas, Brown and McGee and analyzed and compared with DNA collected from various items at the crime scenes. Criminologist Johnny Upshaw testified DNA found on the gun, magazine, and the gloves could not be interpreted—too many samples were found on each that the mixture could not be interpreted—it was neither inclusive nor exclusive of Brown and/or Thomas.

A senior criminologist, Michael Appel, testified about testing he performed on the casings and the bullets recovered at Ashwood and the gun and magazine recovered at the side of the on-ramp. The firearm from the on-ramp was a .38-caliber semiautomatic pistol. Appel explained that semiautomatic and automatic firearms have a slide that feeds a bullet cartridge into the gun's chamber; when the trigger is depressed, the gun will fire the cartridge and the slide will come back again, ejecting the fired cartridge case and feeding a new bullet into the chamber. A semiautomatic will only perform that action once per trigger pull. Upon firing a bullet, semiautomatics will eject the bullet cartridge case. The casings recovered in this case were all .38-caliber, but two of them were from a different manufacturer than the other four. Appel explained that casings will fly about 10 to 15 feet from where the weapon is fired.

Upon test-firing the gun found on the on-ramp, Appel determined it fired normally. The gun also locked the slide back when the ammunition in the magazine was depleted—which is what the gun is designed to do when functioning normally. On a gun

20.

like this, the slide can also be locked back manually. This gun was a single-action/double-action. When the gun was fired in single-action mode, the trigger pull took about 7.5 pounds of force; when operating in double-action mode, the trigger pull required greater than 12 pounds of force.

Appel explained how the gun's barrel leaves distinctive markings on the ammunition it fires. From that, it can be determined whether any bullets recovered were fired from that particular weapon. Appel testified all six of the casings recovered at the scene were fired from the gun recovered on the on-ramp. But because of distortion, he could not determine whether two of the four bullets recovered at the apartment complex were fired from the gun found at the on-ramp, but they both shared class characteristics with that gun (items 9 & 11). However, the other bullets recovered from the laundry room wall were fired from the gun at the on-ramp (items 10 & 12). And, it was also conclusively determined the bullet recovered from the victim's body was fired from the gun found on the on-ramp (item 13). That bullet, however, had a flat spot on it that was indicative of ricocheting off of something hard. These results were verified and confirmed on independent testing by another criminologist.

### 8. Cell Phone Data

Officer Antonio Rivera spoke to Thomas as part of his investigation on July 28, 2015. Thomas indicated his cell phone number, and he identified one of the cell phones found in the car as his. That phone was booked as item 60. Brown identified three cell phones from the car as his: a ZTE Concord phone, labeled item 61; an Apple iPhone 6, labeled item 63; and an LG Optimus, labeled item 62. McGee identified a Samsung Galaxy Note 3 as her phone, it was labeled item 64.

Forensic examination of the cell phones was performed by James Lutter. In the data extraction of Thomas's phone (item 60), one of the contacts in the phone was listed as "N.O. Bee." Contact N.O. Bee sent a text message to Thomas's phone on July 27, 2015, at 6:48 p.m. that said, "'Tell Bsmash call ASAP, it's important.'" At 9:49 p.m. that

21.

night, Thomas's phone sent a text message to N.O. Bee that said, "'Bro, we need tht now.'" A message was received and read by Thomas's phone from N.O. Bee that said, "'Bro, ain't no bullets in DEA … The bitch at work. I'm wot rog right now.'" Thomas's phone sent a message to N.O. Bee that said, "'Where the thang???'" N.O. Bee responded to Thomas's phone, "'At the crib, bro.'" N.O. Bee also sent a message to Thomas's phone that said, "'I wish you woulk ta told me before I left da crib this morning.'" Thomas's phone sent a message back to N.O. Bee saying, "'Damn, but no bullets.'" N.O. Bee responded to Thomas's phone: "'Exactly.'" Thomas's phone sent a text message back to N.O. Bee that said, "'Okay.'"

Thomas's phone also communicated with McGee's phone (item 64). There was no name associated with her number in Thomas's contacts. There were four phone calls and four text messages between Thomas's and McGee's phones on July 27, 2015, which had been deleted before the phone data was extracted. McGee's phone sent a text to Thomas's phone at 10:21 p.m. that said, "'On m[y] way.'" A second message was sent from McGee's phone to Thomas's phone at 10:28 p.m. that said, "'Come outside.'"

### 9. The Autopsy

The victim was found to have a bullet entrance wound on the left side of his back. There was no stippling around the entrance site, indicating the gunshot came from a distance greater than 24 to 30 inches. The copper-jacketed bullet, which the coroner was able to recover from the victim's body, had traveled through the left rib, the lower lobe of the left lung, and had pierced the victim's heart. Abrasions around the victim's forehead and nose were consistent with a fall. The cause of death was deemed the gunshot to the back, and the victim's death was ruled a homicide.

### 10. Interview and Hearing Statements of McGee

On August 6, 2015, Ledbetter interviewed McGee again. For the first time, she talked about overhearing Brown on the phone and that there was some sort of setup planned. She never mentioned McLane High School, nor did she reference First and

McKinley in relation to this setup. She made some reference to a meeting happening at Mayfair, but she also indicated she did not believe the Mayfair area included the Shields and Maple intersection where the Ashwood apartment complex was located. She denied she knew anything was going to happen at Ashwood apartments that night, and she said there was no plan or conversation about what was supposed to happen at Ashwood.

In February 2017 at a follow-up interview with McGee, Ledbetter asked her if she knew anything about men's gloves in her car—she said there should not be any gloves in her car other than perhaps latex gloves she had used for previous work she performed at a warehouse.

In September 2017, McGee gave testimony at a pretrial hearing where she again discussed Brown's phone conversation that she heard in the car the night of the shooting. She indicated she heard Brown say something to the effect the setup was going to happen near McLane High School. That was the first time Ledbetter had heard her use McLane as a location for the setup that she believed Brown was orchestrating.

### 11.    Arrest and Rearrest of Thomas and Brown

Thomas and Brown were arrested on July 28, 2015, but they were released on July 30, 2015, because the allowable period to detain them without charging them with a crime had expired. After additional evidence was processed, Ledbetter sought arrest warrants for Brown and Thomas, which were issued on July 31, 2015. Thomas was arrested on August 21, 2015 and by then had cut off his braids/dreadlocks. Brown was arrested in Las Vegas on September 22, 2015.

## II.    Verdict and Sentencing

The jury found Brown guilty of first degree murder and found true the allegation he had personally used a firearm within the meaning of section 12022.5(a) and that he personally and intentionally discharged a firearm causing death under section 12022.53(d). The jury found Thomas guilty of first degree murder, and found

23.

true an enhancement allegation that a principal was armed with a firearm during the commission of the crime under section 12022(a)(1).

Brown was sentenced to 25 years to life for first degree murder and a consecutive term of 25 years to life for the gun enhancement under section 12022.53(d). The enhancement under section 12022.5(a) was stricken pursuant to section 12022.53(f). Thomas was sentenced to 25 years to life for first degree murder, and the court imposed the one-year enhancement under section 12022(a)(1). Both defendants appealed.

## DISCUSSION

### I.  Substantial Evidence Supports the First Degree Murder Conviction

Brown and Thomas argue there is no substantial evidence of deliberation and premeditation to support a first degree murder conviction, and they maintain the verdict must be reversed or reduced to second degree murder.

Thomas also joins Brown's additional argument that there is no substantial evidence of an intent to kill under either a direct or transferred intent theory that could support a first degree murder conviction. As such, they argue the jury should not have been instructed on transferred intent and the verdict must be reversed on this additional basis.[5]

#### A.  Standard of Review

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357). On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether,

---

[5]  In his opening brief and supplemental reply brief, Thomas joined Brown's argument as to these arguments.

after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio*, *supra*, at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 357.) "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt .…'" (*People v. Nguyen*, *supra*, 61 Cal.4th at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio*, *supra*, at p. 357.)

To be guilty of first degree murder, the prosecution must prove beyond a reasonable doubt that the defendant acted with the intent to kill, and with premeditation and deliberation. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1223.)

**B.      Substantial Evidence of an Intent to Kill (Express Malice)**

**1.      Background**

There was no evidence offered at trial about Brown's and/or Thomas's motive to kill the victim or any link between Brown and/or Thomas and the victim killed. The bullet that struck and killed the victim had ricocheted after first striking another surface. S.L. testified she heard the voice of another person in addition to the victim near the laundry room a few minutes before the shooting, although she never saw anyone other than the victim in that location.

Based on the lack of evidence of a motive, the fact the victim was killed with a ricocheted bullet, and S.L.'s testimony about the possible presence of another person near

the laundry room, the prosecutor requested an instruction on transferred intent, arguing it was possible for the jury to infer the victim was not Brown's intended target. The court instructed the jury on the doctrine of transferred intent: "If the defendant intended to kill one person but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed."

During his closing argument, the prosecutor told the jury the following: "And there's a thing called transferred intent. That is important in a case like this. If the defendant intended to kill one person but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed. One thing that I can't prove to you is who … Brown intended to shoot at that night. It might have been [the victim], it might have been another person. I can't establish that. However, that instruction, transferred intent, means that that's not necessary to prove to have a murder conviction. It doesn't matter who he was trying to shoot at."

Defendants argue this portion of the prosecutor's closing argument was an express concession that the state could not prove that Brown and Thomas intended to kill the victim pursuant to a direct intent-to-kill theory. In addition, defendants contend, there was no substantial evidence of any other intended target, and the court should not have instructed on transferred intent. Because the prosecutor conceded there was no evidence to prove a direct intent to kill the victim, and because there was no substantial evidence of any other intended target to support a transferred intent theory, there was insubstantial evidence of the intent to kill required to support a verdict of first degree murder.

The People maintain the evidence was clearly sufficient to sustain a finding of Brown's intent to kill *someone*—either the victim who was shot or another intended target. The People argue the evidence Brown fired a gun toward the victim in a close-range manner that could result in the infliction of a mortal wound had the bullet been on target supports an inference of the intent to kill. The People maintain there was evidence

from which the jury could have concluded either the victim or another target was the object of that intent to kill.

### 2. Analysis

"A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) Express malice requires an intent to kill "unlawfully." (§ 188, subd. (a)(1).) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.'" (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*), quoting *People v. Saille* (1991) 54 Cal.3d 1103, 1114.) Express malice requires a showing the assailant either desires the result—i.e., death, or knows to a substantial certainty, death will occur. (*People v. Davenport* (1985) 41 Cal.3d 247, 262.)

The doctrine of transferred intent applies to the mental state for murder. The doctrine applies when the defendant intends to kill one person, but mistakenly kills another. (*People v. Bland* (2002) 28 Cal.4th 313, 317.) The intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder. (*Ibid.*) "[A]ssuming legal causation, a person maliciously intending to kill is guilty of the murder of all persons actually killed. If the intent is premeditated, the murder or murders are first degree." (*Id.* at pp. 323–324, fn. omitted.)

Despite the prosecutor's statement to the jury during closing argument that he could not prove "who … Brown intended to shoot at that night," there was substantial evidence to support the jury's verdict under either theory of intent. When evaluating whether a verdict is supported by substantial evidence, a reviewing court examines the *evidence* presented to the jury. The prosecutor's statements and arguments are not evidence, and the jury was so instructed. The existence or lack of substantial evidence does not rise or fall on the wording or phrasing the prosecutor selects—the prosecutor's argument can neither manufacture substantial evidence where there is none, nor sweep away substantial evidence that has been presented. Here, there is substantial evidence

27.

Brown acted with the express malice—i.e., the intent to kill—required for first degree murder, regardless whether the jury concluded the victim was the object of that intent or whether that intent was directed toward another target.

As explained in *Smith*, there is rarely direct evidence of a defendant's intent to kill. Such intent is usually derived from all the circumstances, including the defendant's actions. (*Smith*, *supra*, 37 Cal.4th. at p. 741.) In reviewing a series of general principles, the court observed that "'[t]he act of firing [a gun] toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill .…" [Citation.]'" (*Ibid.*) The People cite *Smith* for this proposition and argue Brown's act of shooting the gun six times toward the laundry room was substantial evidence of an intent to kill, even though the bullet that hit the victim was a ricochet.

Defendants assert that *Smith* has no application here because it is factually distinguishable. *Smith* involved two counts of attempted murder based on the defendant's act of firing a single bullet into a slowly moving vehicle, narrowly missing his ex-girlfriend and her child in the back seat. (*Smith*, *supra*, 37 Cal.4th at p. 736.) Transferred intent does not apply to attempted murder; thus, to establish *attempted* murder as to both the ex-girlfriend and the child, the prosecution had to prove the defendant acted with an intent to kill both the ex-girlfriend *and* the baby when he fired the gun. The court concluded the defendant's act of firing a single round at both mother and baby from close range, each of whom the defendant knew was directly in his line of fire, allowed the jury to infer he acted with the intent to kill both victims. (*Id.* at p. 743.) We agree with defendants that, as an attempted murder case, *Smith* is factually distinguishable, but the principles *Smith* discussed relevant to intent to kill are applicable here.

In *Smith*, before reaching the issue of whether Smith's intent to kill was specific to each victim, a factor not relevant here where *attempted* murder is not at issue, the court

reviewed principles relevant to establishing express malice—a requirement in both first degree willful, deliberate and premediated murder *and* attempted murder.**6** The court articulated two principles of law:  first, while motive may often be probative of intent to kill, it is not an element of a criminal offense and it is not required to establish an intent to kill; second, intent to kill may be inferred from the defendant's acts and the circumstances of the crime.  (*Smith*, *supra*, 37 Cal.4th at pp. 740–741.)  As to the second principle, the court explained the act of firing toward a victim at close, but not point blank, range in a manner that could have inflicted a mortal wound is sufficient to support an inference of the intent to kill.  (*Id.* at p. 741.)

The court explained that these legal principles together reflected that "the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice.  That the shooter had no particular motive for shooting the victim is not dispositive, although again, where motive is shown, such evidence will usually be probative of proof of intent to kill.  Nor is the circumstance that the bullet misses its mark or fails to prove lethal dispositive—the very act of firing a weapon '"in a manner that could have inflicted a mortal wound had the bullet been on target"' is sufficient to support an inference of intent to kill."  (*Smith*, *supra*, 37 Cal.4th at p. 742.)

These general principles discussed in *Smith* apply with equal force here where the intent to kill must be established to support the first degree murder conviction. Construing the evidence in the light most favorable to the judgment and drawing all reasonable inferences therefrom, Brown carried a loaded semiautomatic pistol to an apartment building in the middle of the night.  Despite the 79-degree temperature, Brown

---

**6** "When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*People v. Canizales* (2019) 7 Cal.5th 591, 602.)

had his hood up over his head to conceal his appearance and gloves on to prevent GSR from transferring to his hands upon firing the gun. All of the witnesses saw him with his hood up, and gloves with a significant amount of GSR were found in McGee's car where Brown had been sitting.

Brown had his hand on the gun while he carried it—witnesses testified Brown had his hands in his pockets and it appeared he was carrying something. Brown was ready to quickly fire the gun upon acquiring his target. Brown got his target's attention by asking a couple of questions and then immediately discharged the .38-caliber gun six times in the direction of where the victim had been seen and heard minutes before, emptying the magazine of bullets.

There is no evidence to support an inference the gun was fired at the ground or was somehow fired only to scare the victim or anyone else. All of the gun's ammunition was used, and the gun was fired at human height, evidenced by where the bullets struck the laundry room wall. The jury could infer the gun was aimed to inflict maximum damage on humans in the path of the bullets. (See *People v. Leon* (2010) 181 Cal.App.4th 452, 463–464 [reasonable to infer shot fired at a car's taillight was pointed in the direction of the passenger compartment and that the defendant intended to kill when the backseat passenger was hit by the bullet].) The gun used was powerful—the forensic evidence showed several of the bullets pierced the wall of the laundry room and traveled into the laundry room. The trigger on this particular gun required a fair amount of force to pull—from 7.5 pounds in single-action mode to 12 pounds in double-action mode—supporting an inference the trigger was pulled six times intentionally, not accidentally.

The circumstances of the shooting in combination with evidence the victim and possibly one other person were in the vicinity of the laundry room minutes before the shooting supplied substantial evidence Brown intended to kill whomever the jury concluded he was ultimately targeting.

30.

Defendants maintain that because no one was hit *directly* with a bullet and there is no direct evidence about where Brown aimed the gun, it cannot be established beyond reasonable doubt Brown fired the gun with an intent to kill anyone. Defendants cite *People v. Ratliff* (1986) 41 Cal.3d 675 and *People v. Virgo* (2013) 222 Cal.App.4th 788 (*Virgo*) for the proposition merely firing a weapon does not, in itself, establish an intent to kill. But *Ratliff* is inapposite because the court's discussion there related to what the jury must have *necessarily* concluded about the shooter's intent in considering whether an instructional error was harmless, not whether the shooting under those circumstances constituted substantial evidence of an intent to kill. (*People v. Ratliff*, *supra*, at pp. 695–696.)

*Virgo* is similarly unhelpful. In considering whether several attempted murder convictions were supported by substantial evidence, *Virgo* observed the defendant's shots fired at the ceiling inside the house did not establish the attempted murder of deputies outside the house taking cover on the ground. (*Virgo*, *supra*, 222 Cal.App.4th at p. 799.) Unlike some of the shots fired by the defendant in *Virgo*, nothing similar here suggests Brown fired shots that bore no possible relationship to where the victim or another target was located.

That the victim was hit with a ricochet does not conclusively establish the victim was not in Brown's line of fire. The jury could have reasonably concluded the fact the victim was hit with a ricochet bullet was due to Brown's ineffective shooting abilities, especially since he fired so many times, or that the victim was trying to get away when Brown opened fire. The bullet struck the victim in his back, and the victim ultimately collapsed at the north side of the building away from the laundry room. Brown fired the gun repeatedly toward the location where the victim had been seen and the victim was actually hit with a bullet. There was substantial evidence Brown shot the gun with an intent to kill. The jury could have reasonably concluded the victim was the object of that intent.

31.

Defendants argue there was no substantial evidence to support a transferred intent theory because the prosecution never established definitively that someone else was present at the scene—no one was seen coming or going from the laundry room area, and there was no evidence the other person was the intended target or that Brown harbored a premeditated intent to kill that person. As discussed *ante,* the evidence strongly supported a conclusion Brown acted with an intent to kill given the circumstances of how he fired the gun six times toward the direction of the laundry room, regardless of his specific target. The jury could have reasonably concluded the victim was his target, but the jury could have reasonably drawn a different conclusion given that the victim was hit with a ricocheted bullet in combination with S.L.'s testimony that she heard another voice near the laundry room before the shooting. As defendants have repeatedly noted, the ricochet bullet could support a conclusion the victim was not in the direct line of fire.

In sum, substantial evidence established Brown intended to kill whomever he was specifically targeting at the laundry room—the evidence of that intent to kill did not hinge on the specific identity of his target. The substantial evidence allowed the jury to reasonably conclude the object of Brown's intent to kill was either the victim or the other person S.L. heard near the laundry room before the shooting.

### C.    Substantial Evidence of Premeditation and Deliberation

Defendants additionally contend there was no substantial evidence of premeditation and deliberation, and the first degree murder verdict is therefore unsupported and must be reversed.

#### 1.    Legal Standard

An intentional killing (express malice) "that is premeditated and deliberated is murder of the first degree." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1232.) "'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'" (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) "The very definition of 'premeditation' encompasses the

idea that a defendant thought about or considered the act beforehand." (*Ibid*.) Deliberate means "'"'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'"'" (*People v. Houston* (2012) 54 Cal.4th 1186, 1216.)

"'"'The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly ....'"'" (*People v. Houston, supra,* 54 Cal.4th at p. 1216.)

"In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [(*Anderson*)], [the Supreme] [C]ourt reviewed earlier decisions and developed guidelines to aid reviewing courts in assessing the sufficiency of evidence to sustain findings of premeditation and deliberation. [Citation.] [The court] described three categories of evidence recurring in those cases: planning, motive, and manner of killing." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419–420.) "[H]owever, '[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate.'" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081; accord, *People v. Casares* (2016) 62 Cal.4th 808, 824, disapproved on another ground by *People v. Dalton* (2019) 7 Cal.5th 166, 214.) The California Supreme Court recently reiterated, "In the years since *Anderson*, '"we have emphasized that its guidelines are descriptive and neither normative nor exhaustive, and … reviewing courts need not accord them any particular weight.'" [Citation.] *Anderson* provides 'a framework to aid in appellate review,' but it does not 'define the elements of first degree murder or alter the substantive law of murder in any way.'" (*People v. Morales* (2020) 10 Cal.5th 76, 89, quoting *People v. Rivera* (2019) 7 Cal.5th 306, 324 & *People v. Perez* (1992) 2 Cal.4th 1117, 1125; accord, *People v. Casares*, *supra*, at p. 824; *People v. Halvorsen*, *supra*, at p. 420.)

Yet, the verdict may not stand if based only on "'""fanciful theories and unreasonable inferences [or] resort to imagination or suspicion." [Citation.]' [Citation.] 'Mere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof.'" (*Anderson*, *supra*, 70 Cal.2d at p. 24.)

Our task on review is to determine whether "*any* rational trier of fact could have been persuaded beyond a reasonable doubt" that the murder was deliberate and premeditated. (*People v. Perez*, *supra*, 2 Cal.4th at p. 1127.) Even where a reviewing court could make contrary factual findings or draw different inferences from that of the jury, "we are not permitted to reverse the judgment if the circumstances reasonably justify those found by the jury. It is the jury, not the appellate court, that must be convinced beyond a reasonable doubt." (*Id.* at p. 1126.)

## 2. Analysis Regarding Brown

Defendants argue the finding of premeditation and deliberation was not supported by any substantial evidence could only have been based on improper speculation or conjecture.[7]

We disagree. There was ample circumstantial evidence from which the jury could infer the killing was premeditated and planned in advance, and the evidence about the manner of killing strongly supported an inference the killing was willful and deliberative.

### a. Planning

Defendants argue there is no evidence of planning, but we find an ample basis for the jury to reasonably infer Brown had planned the shooting well before getting to the apartment complex.

A reasonable juror could have concluded Brown went to the Ashwood complex equipped with a concealed and loaded semiautomatic weapon with a plan to kill

---

[7] Thomas joins the arguments made by Brown, but Thomas also presents arguments specific to his liability as an aider and abettor. We address the evidence as to both of them in turn.

someone. (See *People v. Miller* (1990) 50 Cal.3d 954, 993 [keeping pipe in a car and then using it to kill people reasonably suggests the defendant considered the possibility of murder in advance and exhibited planning activity].) There was evidence that Brown knew the vehicle was poised for a quick getaway in a parking lot that had only a single ingress/egress. He wore a hood on a balmy 79-degree night from which it could be inferred he meant to cover up his dreadlocks and obscure his appearance, and there was evidence he wore gloves from which it could be inferred he meant to prevent GSR from transferring to his hands. The witnesses reported Brown walked with his hands in his pockets, and it appeared as though he were carrying something. This was evidence from which a reasonable juror could infer he walked through the complex with his hand on the gun. There was no evidence he appeared to be lost, confused, or was wandering around the complex—he walked from the direction of the west parking lot toward the laundry room. It took him less than three minutes outside of the car to accomplish the shooting and return to the car.

Brown knew where he was going and who he was looking for—an inference that was supported by the entire arch of the evening's events, the fact he and Thomas were only out of the car for mere minutes before the shooting occurred, and the conversation McGee overheard about a deliberate, prearranged setup. The two or three questions witnesses heard and saw Brown ask in the courtyard were followed *immediately* by the sound of gunshots, which supported an inference Brown had located the victim and fired as soon as the victim looked up or engaged with the questions. The timing of the questions followed by the gunshots also supported an inference the victim had been preselected before Brown even arrived at the complex—there was no argument, conversation, or even hesitation between the questions and the shooting. (See *People v. Miranda* (1987) 44 Cal.3d 57, 87 [lack of provocation by victim allows an inference that the attacks were result of deliberate plan rather than "'rash explosion of violence'"], abrogated on another ground by *People v. Marshall* (1990) 50 Cal.3d 907, 993, fn. 4.)

35.

The evidence pointed to an orchestrated and preplanned shooting of a particular person in a particular location.

Brown argues there were different inferences the jury could have drawn. McGee related very few details about Brown's conversation that she overheard, and she was convinced it had nothing to do with the shooting at Ashwood. Brown and Thomas had conversations that night out of McGee's presence, but Brown points out there was no evidence what was said. It is true the jury could have drawn different inferences about the evidence. However, it is not a reviewing court's role to reevaluate the evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 58.) Rather, we must presume the existence of every fact in support of the verdict that could reasonably be inferred from the evidence. (*People v. Booker* (2011) 51 Cal.4th 141, 173.)

Moreover, Brown's argument ignores the fact that he carried a loaded weapon into a specific apartment complex with a car and driver waiting, put up his hood and wore gloves on a nearly 80-degree night, kept his hands in his pocket with the weapon, walked directly to where his victim was located, and fired the gun immediately upon obtaining confirmation his selected victim was present through the use of the questions. All of this was accomplished in about two or three minutes, after which Brown immediately returned to the vehicle, took off the gloves, and got rid of the weapon. There was ample evidence of planning.

### b. Manner of the Killing

Another factor the *Anderson* court identified that may establish a deliberate and premediated killing is how the killing is carried out—i.e., the manner of killing. Such evidence will tend to show the killing "was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life .…" (*Anderson*, *supra*, 70 Cal.2d at p. 27.) Here, there were facts about the manner of the killing from which the jury could infer that Brown intentionally killed the victim according to a preconceived plan or design.

Defendants argue nothing about the manner of killing indicates a preconceived plan or design. Defendants point out there may have been others beside the victim present at the laundry room, and there was no indication where the victim was standing when the shots were fired. The victim was killed with a ricochet bullet, suggesting the gun was not aimed at the victim, and S.L. testified she thought Brown looked surprised when the gun went off so many times. Defendants maintain this evidence was much more consistent with a random explosion of violence rather than a calculated murder.

We disagree. As noted, the entire process of getting to the laundry room, locating the target, and shooting the gun six times took only about two minutes. Significantly, Brown did not fire the gun once or twice; he fired *six* times, emptying the magazine. The 7.5 to 12 pounds of pressure needed to repeatedly pull the trigger indicates firing that many shots was no accident. He fired the shots from west to east toward where the victim had been seen near the laundry room minutes before. Most of the bullets hit the west-facing side of the laundry room wall about two feet to four feet above the ground. It can be inferred these shots were meant to strike at human height. He fired the gun without hesitation or delay after posing a few questions; the gun was so powerful several of the shots passed through the wall of the laundry room. (See *People v. Wright* (1985) 39 Cal.3d 576, 594 [shooting victim on sight with no hesitation at close range with large-caliber gun "could well support an inference by the jury that the manner of killing was 'particular and exacting'"].)

Together, the evidence reflects not just planning in advance—the gun, the ammunition, the gloves, the hood, the phone call about a setup—but also careful considerations of a course of conduct while engaged in the process of locating the victim and firing a powerful gun at human height until it was out of ammunition.

Given the evidence of planning and how the killing was performed, substantial evidence supported the jury's conclusion of a willful, deliberative and premeditated murder.

### 3. Analysis Regarding Thomas

Aiders and abettors may be convicted of first degree premeditated murder under a direct aiding and abetting theory. (*People v. Chiu* (2014) 59 Cal.4th 155, 166–167 (*Chiu*), superseded by statute in part as stated in *People v. Gentile* (2020) 10 Cal.5th 830, 849.) Establishing aider and abettor liability "requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

To convict a defendant of first degree murder as a direct aider and abettor, "the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Chiu*, *supra*, 59 Cal.4th at p. 167.) An aider and abettor to first degree premeditated murder must aid or encourage the direct perpetrator in the commission of the murder and act with his or her own willfulness, premeditation, and deliberation. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118; *People v. Penunuri* (2018) 5 Cal.5th 126, 146.)

Thomas joins Brown's arguments above, but separately discusses the evidence relevant to his conviction as an aider and abettor. Thomas argues the evidence that he participated in any planning of the killing was "extremely weak." We disagree. There was evidence Thomas arranged to obtain, on an urgent basis, the gun or the ammunition based on his text messages with N.O. Bee. Thomas solicited the ride from McGee right around the time he was discussing a gun or ammunition with N.O. Bee. Thomas directed McGee to an apartment complex where he and Brown stayed for only a few minutes. Although there is no evidence what happened at that first stop, it established there was an

38.

opportunity between Thomas's texts with N.O. Bee and the shooting to pick up the gun and/or ammunition Thomas said he needed in his message with N.O. Bee.

Thomas and Brown had a private conversation outside of the car before they drove to the Ashwood apartment complex. It was Thomas who directed McGee to go to Ashwood. (See *People v. Wright*, *supra*, 39 Cal.3d at pp. 592–593 [obtaining loaded firearm and seeking out the victim constitutes evidence of planning activity from which the jury could reasonably find premeditation].) Once at the Ashwood apartment complex, Thomas directed McGee to back into a parking spot from which the jury could infer he knew what was planned and saw the need for a quick escape. Thomas got out of the car with Brown and accompanied Brown to the complex's inner courtyard. He and Brown had a short conversation before Brown advanced toward the laundry room alone. Right after the shooting, there is no evidence Thomas parted company with Brown after the shooting—they arrived back at McGee's car together.

Thomas argues the circumstances of the shooting show only that Brown was seeking marijuana based on Brown asking about "trees," after which someone started firing wildly and only randomly hit the victim with a ricochet bullet. Thomas argues the fact he arranged for a ride from McGee was consistent with attempting to purchase drugs, a purchase that apparently went wrong. Yet, other than Brown's question about trees seconds before the shooting, there was no evidence Brown went to the apartment complex to buy drugs. Moreover, Brown started firing the gun immediately after he asked the questions—there was no argument or discussion between the questions and the shooting suggesting an actual attempt to purchase anything. Besides Brown's question about trees, there is no evidence to infer Thomas planned to obtain the gun and/or ammunition and the ride for purposes of a drug transaction.

Thomas points out he did not advance as far into the complex as Brown and he was not with Brown when the shots were fired, so the manner of killing says nothing about what Thomas intended or deliberated. But there was evidence Thomas knew what

39.

was going to happen and nonetheless accompanied Brown to the courtyard to give aid and encouragement. He and Brown talked just before Brown advanced alone into the courtyard. Thomas then hung back, allowing for an inference he knew what was planned and either did not want to be seen by witnesses or wanted to stay out of the line of fire. Thomas did not disassociate himself with Brown or otherwise part company with him when the shooting happened; they returned to the car together—a jury could reasonably infer the shooting was not a surprise to Thomas. (See *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1095 [presence at scene of crime, fleeing with perpetrator and two others, and maintaining perpetrator's company shortly after without disassociation supported aider and abettor liability for robbery].) This was substantial evidence from which a reasonable jury could infer Thomas knew what Brown intended and that Thomas shared that intent.

Based on all of the foregoing, a reasonable jury could have concluded beyond a reasonable doubt that Brown murdered the victim willfully with premeditation and deliberation and Thomas, knowing of Brown's intent and possessing the same mental state, aided and abetted him in doing so.

## II. Evidentiary Challenges

Defendants claim the trial court erred in admitting Hall's testimony about what S.L. told her, and the court erroneously admitted text messages between McGee and a friend that constituted hearsay. Brown argues McGee's testimony about what she overheard of Brown's phone conversation was irrelevant and admitted in error.

### A. Admission of S.L.'s Prior Statement to Hall

#### 1. Background

A few hours after the shooting, Ledbetter interviewed S.L. at the apartment complex about what she had seen. She denied seeing anyone other than the hooded man in the courtyard, and when Thomas was shown to her during the field showup, she said she had not seen him that night but he looked familiar to her.

On September 18, 2017, the day before S.L. testified, S.L. spoke with Sherri Hall, an investigator from the D.A.'s office. S.L. asked to review her prior statement to police, which she did. S.L. then told Hall she wished to make a correction: on the date of the shooting, in addition to the hooded man, she had seen a Black male, medium build, and wearing a white T-shirt. S.L. told Hall she had seen the man in the white T-shirt peer around the corner from where she was seated that night, that he had looked directly at her, and then he moved back out of her view. She told Hall she had told Ledbetter she had seen only one person on the night of the shooting in the courtyard—the man in the hoodie. S.L. told Hall that was the only part of her prior statements to police that was incorrect.

At trial, S.L. testified she saw two people come into the apartment complex's courtyard while she was seated with Shawna and Jennifer. The first man she saw was dressed in a black hoodie and she could only see the side of his face. The second person was in a white T-shirt—he was not as tall as the man in the hoodie nor as skinny. She saw the man in the white T-shirt peering out from behind a wall. The hooded man was looking straight ahead, but then he looked back at the man who was behind him. She never saw the man in the white T-shirt after the shooting.

S.L. testified she remembered telling officers that night she had not seen the man in the white T-shirt. She explained she was trying to decide for herself, but her mother kept giving her own input; S.L did not want it to seem as though she were lying if she was saying something different from her mother, so she just said she had not seen the man in the white T-shirt.

Defendants argue S.L.'s statements to Hall were hearsay and were admitted erroneously because they did not meet the temporal requirement of the hearsay exception for prior consistent statements under Evidence Code section 791. Defendants argue that for these statements to be offered as prior consistent statements, they must have been made *before* S.L. made her initial statement to police—making the prior consistent

statement two years *after* S.L.'s initial statement was well after any motive to fabricate would have arisen.

The People assert defendants' hearsay argument is forfeited for purposes of appeal because neither defendant objected to the admission of these statements at trial. But even if the argument was not forfeited, the People maintain any error in admitting S.L.'s statements to Hall was harmless because it was duplicative of S.L.'s trial testimony.

In response, defendants contend the People implicitly concede the admission of S.L.'s statements to Hall was erroneous as the People make no claim the statements were properly admitted. Defendants argue S.L.'s prior statement to Hall had the effect of improperly bolstering S.L.'s *entire* trial testimony—which was far more inculpatory than that of Shawna or Jennifer. This error was so egregious it rendered their trial fundamentally unfair and this court should address their claim even if the issue was technically forfeited below for failure to object.

## 2. Analysis

Defendants did not raise this objection to S.L.'s prior statement during trial, and the claim is therefore forfeited on appeal. (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 30, citing *People v. Williams* (1976) 16 Cal.3d 663, 667, fn. 4 ["It is the general rule … that questions relating to the admissibility of evidence will not be reviewed on appeal absent a specific and timely objection at trial on the ground sought to be urged on appeal."].)

On the merits, even assuming S.L.'s statement to Hall about seeing the man in the white T-shirt was erroneously admitted, the error did not render the trial fundamentally unfair such that it constituted a constitutional due process error nor was the error prejudicial under state law.

Defendants argue Hall's testimony was used to bolster S.L.'s credibility with the jury and suggested S.L.'s trial testimony was more honest and more accurate than her statement to police. In particular, when S.L. testified at trial for the first time that she had

actually *seen* Brown shoot the gun that night, defendants claim Hall's testimony made that statement more credible and believable.

Defendants do not explain precisely how Hall's testimony bolstered S.L.'s entire trial testimony. It is difficult to conclude it would have had any positive effect on S.L.'s trial testimony, let alone bolster all of it. S.L.'s statement to Hall was made two *years* after S.L.'s interview with Ledbetter—it was not a timely correction given it was an inaccuracy S.L. always knew existed. Nor was the interview with Hall initiated by S.L. in an effort to correct an inaccuracy after more mature reflection given her age at the time of the shooting. S.L. merely told Hall what she was going to say at trial, and Hall's testimony included nothing that was not covered in S.L.'s trial testimony. The only possible benefit of Hall's testimony was to show that S.L. was not modifying her version of events for the very first time on the witness stand. But the credibility benefit of that would have been extremely limited considering S.L. spoke with Hall the day before S.L. testified at trial.

At trial, S.L. claimed she was contradicting her prior statement to Ledbetter about the man in the white T-shirt because her mother had been with her when Ledbetter interviewed her and when S.L. participated in the infield showups. S.L.'s implicit admission she was influenced about how she reported things to police that night because of her mother did not bolster the credibility of anything she told Ledbetter or the police. But, the fact that S.L. told Hall about seeing the man in the white T-shirt did not create any aura of credibility around her trial testimony. S.L. changed her statement to Ledbetter *years* after the shooting and only one day before she testified. The passage of time between the shooting and what she told Hall made any discrepancy or change from her initial interview generally less credible, not more so. The mere fact S.L. told Hall about the change in her version of events the day before she testified at trial did nothing to make her trial testimony inherently more believable or credible.

43.

As for S.L.'s trial testimony she saw Brown shoot the gun, which was inconsistent with her interview statement to Ledbetter that her view was obstructed when the gun was fired, this never came up with Hall. In fact, Hall testified S.L. pointed to no other discrepancies in her statements to Ledbetter other than seeing the man in the white T-shirt in the courtyard. Far from bolstering S.L.'s trial testimony, this was another reason for the jury to question S.L.'s testimony in this regard. She never told Ledbetter she saw Brown shoot the gun, and she did not identify that as an error or omission when she spoke with Hall. Hall's testimony did nothing to bolster S.L.'s credibility in a meaningful way.

S.L. was subjected to thorough cross-examination on the differences between her statements to Ledbetter and her trial testimony. The jury was aware S.L.'s statement to Hall was made only one day before S.L. testified, and that the statement to Hall and her testimony at trial were more than two years after the shooting. Hall's testimony that S.L. told her she had seen the man in the white T-shirt on the night of the shooting did not render defendants' trial fundamentally unfair.

For these same reasons and because Hall's testimony was duplicative of S.L.'s testimony regarding seeing the man in the white T-shirt, there is no reasonable probability defendants would have received a more favorable result if Hall had not testified about what S.L. told her. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [establishing harm from state law error requires a defendant to show it is reasonably probable a more favorable result would have been obtained absent the error]; *People v. Boyette* (2002) 29 Cal.4th 381, 427–428 [when error is simply one of state evidentiary law, review standard under *Watson* applies]; *People v. Beltran*, *supra*, 56 Cal.4th at p. 956 [*Watson* harmless error test focuses not on what a jury could do, but on what likely to have done in the absence of the error].)

**B.     Admission of McGee's Testimony About Brown's Phone Conversation**

Brown maintains McGee's testimony about what she overheard him saying on the phone that night was irrelevant, and the trial court erred in admitting it.  Brown claims the state law error also violated his federal right to due process and a fair trial, but regardless, the error was prejudicial under even the less stringent state law harmless error test.

**1.     Background**

Before trial, defense counsel moved to exclude McGee's testimony about Brown's phone conversation that McGee overheard.  Defense counsel argued the phone conversation was not relevant to the charged crime because it related to something that was going to happen only at First and McKinley, not at the Ashwood apartments where the shooting occurred.  The prosecution argued the testimony, in conjunction with McGee's text message, was evidence Brown and Thomas went to Ashwood with an intent to commit a robbery.

On September 15, 2017, an Evidence Code section 403 hearing was held to determine the relevance of McGee's testimony about the phone call.  McGee testified she met Thomas and Brown on the night of the shooting at First and McKinley.  While they were in the car together, McGee heard Brown talking on his phone telling someone she assumed was female to have someone go somewhere in the area of First and McKinley— in the Mayfair area.  Brown was telling the girl to act drunk and like they were going to party.  It sounded like a setup to rob somebody.  After the call, Brown and Thomas got out of the car to have a conversation.  When they got back in the car, she drove them back exactly to where she had picked them up originally.  Brown got out of the car and went into an apartment.

On cross-examination, McGee confirmed nothing she had heard Brown say made her think something was going to happen at Shields and Maple where the Ashwood apartment was located.  McGee believed that Shields and Maple is not in the Mayfair

area.  She believed that whatever Brown was planning was going to occur at the First and McKinley location.

On redirect examination, McGee recalled Brown saying they were by McLane, but she reiterated her belief that everything was going to happen at First and McKinley. Ledbetter testified the Ashwood apartment building is roughly at the intersection of Shields and Maple.  As far as the reference to McLane, Ledbetter testified the distance from McLane High School to Shields and Maple was about one-sixteenth to a quarter-mile as the crow flies.

At the hearing's conclusion, the prosecutor argued it was reasonable to infer the conversation related to a setup near Ashwood.  The prosecutor maintained this was so because McGee heard reference to McLane and McLane is close to where the shooting occurred.  The prosecutor argued that when McGee had referenced Mayfair in prior statements to Ledbetter, she really meant McLane.  Brown's counsel argued McGee's testimony was so tenuous it ran the risk of being incredibly prejudicial yet totally speculative and irrelevant.  McGee's testimony was that she believed the setup was going to occur at First and McKinley.

The court concluded that a reasonable jury could find Brown's conversation had a bearing on his planned activities for the evening.  The court reasoned it could show the presence of a motive and, assuming it were established, that the victim in this case was one of the persons who was to be set up and could go to establish the issue of premeditation and intent. The court also indicated it would give a limiting instruction precluding the jury from using Brown's statements during the phone call against Thomas.

On appeal, Brown argues geography was central to the relevance of this phone conversation.  Even assuming McGee overheard something having to do with a setup, her own testimony confirmed the events were to occur at First and McKinley, which, according to Brown, is more than two and one-half miles from Ashwood.  Further, even if McGee overheard the events were going to occur at McLane, this is approximately one

mile away from Ashwood. Either way, the conversation had nothing to do with Ashwood, and it should not have been admitted.

### 2. Standard of Review

We review the court's rulings on the admissibility and relevancy of evidence for abuse of discretion. (*People v. Merriman* (2014) 60 Cal.4th 1, 74; *People v. Clark* (2016) 63 Cal.4th 522, 590.) Such rulings "'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Brown* (2003) 31 Cal.4th 518, 534; accord, *People v. Jackson* (2016) 1 Cal.5th 269, 330.) A trial court has "considerable discretion" in determining the relevance of evidence. (*People v. Williams* (2008) 43 Cal.4th 584, 634.)

### 3. Analysis

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The test of relevance is whether the evidence tends to logically, naturally and by reasonable inference establish material facts such as identity, intent, or motive. (*People v. Williams*, *supra*, 43 Cal.4th at p. 633; *People v. Hamilton* (2009) 45 Cal.4th 863, 913.)

The court did not abuse its discretion in admitting McGee's testimony about Brown's phone call. Brown focuses on the fact McGee definitively stated she believed that whatever setup Brown was orchestrating related only to the area of First and McKinley. But the relevance of the conversation does not hinge on the exact location she heard Brown discussing. McGee mentioned several locations she overheard Brown reference for the setup, including First and McKinley, Mayfair, and McLane. All of these areas are less than three miles from Ashwood. Brown was not discussing a setup in

47.

another city; he was discussing a setup to occur that night somewhere within a small geographic area that was a short distance from Ashwood.

More than that, the phone call revealed the setup was being orchestrated about an hour before the shooting. McGee's testimony indicated the setup was going to occur that night because she thought it was "strange," it gave her "a weird feeling," and she wanted to go home when she heard this. After the call, Brown and Thomas had a private conversation outside the vehicle, and then they got back into the car and she drove them back to the same spot she had picked them up originally.

Thomas waited with McGee in her car while Brown went to his apartment to charge his phone. There was certainly time and opportunity for Brown to alter the precise details of the setup after this phone call, regardless of what McGee heard at that particular time about the precise location. The content and timing of the call was relevant to whether the killing an hour later was planned and intentional.

Although the trial court did not have the benefit of the trial testimony at the time of the Evidence Code section 403 hearing, the trial evidence confirmed the conversation was relevant and tended to support the other evidence indicating the killing was planned in advance. There was sufficient evidence for the jury to reasonably infer Brown walked into the Ashwood courtyard with his hood up, gloves on, and his hands in his pockets on the gun.

Based on McGee's estimate, Brown walked from McGee's vehicle to the laundry room, acquired his target, fired six times, and got back to McGee's waiting car in about three minutes. The witnesses inside the complex saw the hooded man they later identified as Brown walk across the courtyard toward the laundry room, heard and saw him ask two or three questions of someone, and then immediately they heard a gun shoot five or six times; Brown was then seen running or jogging back toward the west parking lot. The witnesses never said Brown appeared lost, and the shooting occurred very

quickly after the witnesses first saw him. There was no argument or pause after Brown asked questions—the gun was fired immediately and repeatedly.

Brown's preparation and the speed at which Brown was able to locate and kill the victim pointed to a prearranged and orchestrated killing. The fact Brown was engaged in a phone conversation about a setup at a location near Ashwood an hour before the shooting was relevant and, along with the other evidence, supported an inference the killing was planned and intentional.

McGee's stated belief the setup was going to occur near First and McKinley and not Ashwood, and her express statements she did not believe anything was going to happen at Shields and Maple, went to the weight and credibility of her testimony, not its relevance. The locations she overheard were all within a couple miles or less of Ashwood, and the phone call was just an hour before the killing was executed in what appeared to be a planned and orchestrated manner. She had initially held back any mention of the phone conversation when she talked to Ledbetter. She varied where she said the overheard setup was supposed to occur—she mentioned First and McKinley, Mayfair, and McLane. She certainly had motives to lie about the precise details of that call—she was afraid of Brown and Thomas and she thought she might bear some type of criminal culpability if she had known the conversation was linked to Ashwood. The conversation was relevant to the issue of planning—it was for the jury to assess what weight to give what portions of McGee's testimony.

Having found no state law error, we reject defendant's federal constitutional claim. (See *People v. Abilez* (2007) 41 Cal.4th 472, 503 ["garden-variety evidentiary issue under state law and did not implicate [the] defendant's federal constitutional right to present a defense"].)

## C. Admission of McGee's Text Message

### 1. Background

At a pretrial hearing, Brown objected to a text message between McGee and her friend on the night of the shooting as hearsay with no exception. The text message was deemed admissible and the prosecutor asked McGee a series of questions about the text message at trial after the message had been admitted as an exhibit.

> "Q So at 11:06 p.m., did your friend ask you, 'What's wrong?'
>
> "A Yes.
>
> "Q And then did you respond with the text that is listed below?
>
> "A Yes.
>
> "Q I'm going to ask that you read that, please.…
>
> "A … It says, 'They is doin' weird ass shit, shaking my head. They're having bitches set motherfuckers up and shit, shaking my head. I wanna go home. I don't want to be involved in no weird ass shit, for real, for real.'"

Defendants argue that even if the text message was reciting a statement of either defendant that could have been admitted as a party admission, the text itself was hearsay and required its own exception to be admissible. Although the prosecution argued at the motions in limine hearing he planned to use the text if McGee denied it had something to do with a planned robbery, the text was admitted before McGee denied anything and she ultimately never denied she thought the phone conversation was about a setup.

The People contend the question "'What's wrong?'" asked by McGee's friend was not an assertive statement and not offered for truth. Moreover, the text messages McGee sent her friend were not hearsay because McGee testified at trial and authored her own messages. But even assuming the text messages were admitted in error, the error was harmless.

50.

### 2. Analysis

"On appeal, 'an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question .…'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007–1008.)  Under the abuse of discretion standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.  (*Id.* at p. 1004.)

"The 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.'" (*People v. Hovarter*, *supra*, 44 Cal.4th at p. 1010.)  "'The admission of evidence results in a due process violation only if it makes the trial fundamentally unfair.  [Citation.]  "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'  [Citation.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose."'" (*People v. Coneal* (2019) 41 Cal.App.5th 951, 972.)

We dispense with an analysis of whether the text message constituted inadmissible hearsay because even assuming the text message was admitted in error, it did not result in a fundamentally unfair trial nor was it prejudicial under state law.  McGee's testimony about Brown's conversation was admitted, and the text message added no additional information.  Defendants were able to cross-examine McGee extensively about what she overheard from Brown's phone call.

Defendants argue the message added weight to McGee's testimony by showing that at the time she was in the car, not just at trial, she believed they were planning a setup.  But there was little reason to doubt her testimony that she overheard Brown's phone call about a setup such that corroboration would have been helpful.  Reporting the phone call and then testifying about it were against her interests in two ways, both of

which the jury was aware: it showed she may have known something about what was going to happen—she thought she might be criminally liable if she knew the setup related to what happened at Ashwood; and she had fears that her testimony would anger defendants, as she felt Thomas had already threatened her about talking to the police.

Defendants argue the text message supported the theory they were involved in the shooting, rather than merely bystanders. However, additional confirmation through the text message that Brown was planning a setup did nothing to connect him to the gun or identify Brown as the shooter. That was all established by other evidence, including other witnesses' testimony; the fact Brown and Thomas were stopped by law enforcement minutes after the shooting and the gun that fired the lethal bullet was a few hundred feet from the car they were in; that they were wearing clothing that matched what the witnesses saw them in at the apartment; and that Thomas had GSR on his hands, and gloves found in the backseat where Brown had been sitting had a significant amount of GSR.

Defendants claim the opening text from McGee's friend asking "'What's wrong?'" allowed the jury to infer McGee had precipitated that question by texting something alarming and invited the jury to speculate about what that might have been. However, McGee testified about why she sent the text—the jury knew it scared her and she wanted to go home. Additionally, had the initiating text message that prompted the question been of material value, the jury would likely have inferred the prosecution would have offered it. There was no reason for the jury to speculate the initiating text message would have been damaging to defendants.

Defendants argue that without the text messages, McGee may have been considered an accomplice, allowing them to argue her testimony about the setup was an attempt to minimize her involvement. This argument is without any citation to authority, and it is not persuasive. "An accomplice is … defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the

testimony of the accomplice is given." (§ 1111.) Under section 1111, "'[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.'" When there is sufficient evidence that a witness is an accomplice, the trial court is required to instruct the jury on the principles governing the law of accomplices, including the need for corroboration. (*People v. Tobias* (2001) 25 Cal.4th 327, 331.) The reason for the cautionary instruction is that an accomplice is inherently untrustworthy because he or she usually testifies in the hope or expectation of immunity, and an accomplice may try to shift the blame to the defendant in an effort to minimize his or her own culpability. (*Ibid.*)

Defendants point to no evidence suggesting McGee was an accomplice under section 1111 to warrant the cautionary accomplice instruction. McGee testified she thought she was giving Thomas a ride, she did not ask him any questions, and she never saw a gun. She was not involved in any conversations about obtaining the gun, and there were times when she was with them that Thomas and Brown talked outside her presence. She claimed she did not know the details and she thought whatever was planned was going to occur at First and McKinley. Even to the extent the jury did not believe McGee's testimony about where the setup was to occur or concluded the location changed after she heard the conversation, there was no evidence she knew what the setup *specifically* entailed. While she drove Brown and Thomas to and from the crime scene, "mere accessories are not accomplices under section 1111." (*People v. Daniels* (1991) 52 Cal.3d 815, 867.) The text message was not needed to rebut her potential status as an accomplice—there was no sufficient evidence that McGee acted as an accomplice.

We also cannot conclude the text messages bolstered McGee's testimony in any meaningful way. They did confirm she heard something about a setup, but offered no additional details. The text messages were duplicative of her testimony regarding

Brown's phone call about which she was subject to vigorous cross-examination. Admission of the text messages, even if erroneous, did not render defendants' trial fundamentally unfair nor was it reasonably probable that, but for admission of the text messages, defendants would have obtained a more favorable result. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

## III. Instructional Error Claims

Defendants make two claims of instructional error: (1) the trial court erroneously failed to instruct on the lesser included offense of involuntary manslaughter; and (2) the jury was improperly instructed to consider a witness's certainty in making an identification under CALCRIM No. 315. Brown alone argues the trial court's instruction under CALCRIM No. 359 was erroneous.

### A. Involuntary Manslaughter Instruction Was Not Required

#### 1. Standard of Review

Voluntary and involuntary manslaughter are lesser included offenses of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) Even in the absence of a request, the trial court has an obligation to instruct on a lesser included offense if substantial evidence would support a jury verdict that the defendant was guilty only of the lesser included offense and not the greater offense. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196; *People v. Romero* (2008) 44 Cal.4th 386, 402–403.) Substantial evidence is evidence from which a jury of reasonable people could conclude that the lesser offense, but not the greater, was committed. (*People v. Romero*, *supra*, at p. 403; *People v. Breverman* (1998) 19 Cal.4th 142, 162.) "Even evidence that is unconvincing or subject to justifiable suspicion may constitute substantial evidence and may trigger the lesser-included-offense requirement." (*People v. Vasquez* (2018) 30 Cal.App.5th 786, 792 (*Vasquez*).) Yet substantial evidence does not equate to "'*any* evidence, no matter how weak'" (*People v. Breverman*, *supra*, at p. 162); accord, see *People v. Simon* (2016) 1 Cal.5th 98, 132 ["Speculative, minimal, or insubstantial evidence is insufficient to require

an instruction on a lesser included offense."]).  The duty to instruct on lesser included offenses is an issue of state law, not one of federal constitutional law in noncapital cases. (*People v. Gonzalez*, *supra*, at p. 198.)

We review the trial court's failure to instruct on a lesser included offense de novo. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30; *Vasquez*, *supra*, 30 Cal.App.5th at p. 793.)  In doing so, we consider the evidence in the light most favorable to defendants. (*People v. Brothers*, *supra*, at p. 30.)  We do not evaluate witness credibility, and we resolve "uncertainty about whether the evidence is sufficient to warrant instructions" in defendants' favor.  (*Vasquez*, *supra*, at p. 792.)

### 2. Analysis

Manslaughter is "the unlawful killing of a human being without malice."  (§ 192.) "Accordingly, an instruction on involuntary manslaughter is required whenever there is substantial evidence indicating the defendant acted without conscious disregard for human life and did not form the intent to kill."  (*Vasquez*, *supra*, 30 Cal.App.5th at p. 794, fn. omitted.)

Defendants argue there was substantial evidence of a lack of malice that supported an instruction on involuntary manslaughter.  Specifically, defendants point to the fact it was a ricochet bullet that struck the victim, and no other bullets made contact with anyone.  From this, defendants argue there was a basis to draw an inference Brown never fired the weapon at anyone—that perhaps he just fired the weapon at the ground or fired the weapon to scare the victim.  There was no eyewitness to the shooting itself and no evidence whether the gun was aimed at the victim when it was fired, particularly in light of the fatal shot being a ricochet.

The People dispute there was substantial evidence to warrant an instruction on involuntary manslaughter.  Brown traveled to the Ashwood apartment complex with a loaded firearm and fired six times before fleeing the scene.  At a minimum, Brown's act

of firing the weapon six times showed a conscious disregard for human life—implied malice.

Defendants respond that even if Brown fired the weapon, there is substantial evidence he had no "intent to kill" in doing so. Yet, the absence of an intent to kill does not show an absence of any malice. "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.) "[T]he state of mind of a person who acts with conscious disregard for life[, i.e., implied malice,] is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.'" (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988.)

Defendants' reliance on *People v. Wilson* (1967) 66 Cal.2d 749 is unavailing. After discovering men were visiting at his estranged wife's apartment, the defendant took a shotgun, forcibly entered her apartment, and killed her and another man. (*Id.* at pp. 752–753.) His testimony at trial was that he did not enter the apartment with any intent to kill, only to scare, which was supported by other evidence. (*Id.* at p. 756.) Based on this, there was evidence his use of the weapon was only a misdemeanor, the felony-murder rule was not applicable, and the court noted the jury could find an absence of malice. (*Id.* at pp. 757–758.) There is no similar evidence here that points to an absence of any malice.

Brown fired a .38-caliber semiautomatic weapon six times in the courtyard of an occupied apartment complex. Four bullets hit the laundry room wall at approximately two to four feet above the ground, evidence they were fired at human height. Several of the bullets went through the laundry room wall and could have struck someone inside the laundry room; one bullet traveled to the east parking lot, and the other bullet hit the victim. There is no evidence to support an inference any of the bullets were fired at the

ground or that they were fired only to scare the victim; and the risk of ricochets or a stray shot was obvious.

Even if a reasonable jury could conclude Brown did not exhibit an intent to kill by firing the gun the way he did, there was no evidence from which the jury could infer Brown acted without implied malice to warrant in involuntary manslaughter instruction. The trial court did not err in failing to instruct on involuntary manslaughter.

## B. Instruction on Eyewitness Certainty (CALCRIM No. 315)

### 1. Background

Eyewitness testimony was offered by three witnesses. The jury was instructed how to consider witness testimony pursuant to the pattern instruction, CALCRIM No. 315. The court instructed the jury to consider the following questions in evaluating identification testimony of the witnesses:

(1) "Did the witness know or have contact with the defendant before the event?"

(2) "How well could the witness see the perpetrator?"

(3) "What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance and duration of observation?"

(4) "How closely was the witness paying attention?"

(5) "Was the witness under stress when he or she made the observation?"

(6) "Did the witness give a description and how does that description compare to the defendant?"

(7) "How much time passed between the event and the time when the witness identified the defendant?"

(8) "[W]as the witness asked to pick the perpetrator out of a group?"

(9) "Did the witness ever fail to identify the defendant?"

57.

(10)  "Did the witness ever change his or her mind about the identification?"

**(11)  "How certain was the witness when he or she made an identification?"**

(12)  "Are the witness and the defendant of different races?"

(13)  "Was the witness able to identify other participants in the crime?"

(14)  "Was the witness able to identify the defendant in a photographic or physical lineup?"

(15)  "Were there any other circumstances affecting the witness's ability to make an accurate identification?"  (Boldface added.)

The instruction concluded with this final statement:  "The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

Defendants argue the trial court violated their right to due process by listing the witness's level of certainty as one of the 15 factors the jury should consider when evaluating eyewitness identification testimony.  They argue this instruction reduced the state's burden of proof and undercut their right to present a defense.  The People maintain this claim was forfeited because no objection was made to the instruction at trial, but even if the merits were considered, the People argue the claim fails.

### 2.  Forfeiture

This claim of instructional error was forfeited because no objection or request for modification was made at trial.  (*People v. Sanchez* (2016) 63 Cal.4th 411, 461–462 (*Sanchez*) [forfeiture of instructional challenge to predecessor instruction CALJIC No. 2.92 for failure to seek modification of instruction at trial].)

### 3. Analysis

Even considered on its merits, the claim fails.[8] Defendants' argument about CALCRIM No. 315 is based on empirical research showing that confidence in an identification is generally not a reliable indicator of accuracy. (See *People v. Wright* (1988) 45 Cal.3d 1126, 1142, fn. 13; *State v. Lawson* (2012) 352 Ore. 724, 777 ["studies show that, under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy"]; *State v. Cabagbag* (2012) 127 Hawaii 302, 311 ["Empirical research has also undermined the common sense notion that the confidence of the witness is a valid indicator of the accuracy of the identification."]; *Sanchez, supra*, 63 Cal.4th at p. 497 (conc. opn. of Liu, J.) [noting "a committee of the National Academy of Sciences wrote: 'Evidence indicates that self-reported confidence at the time of trial is not a reliable predictor of eyewitness accuracy.'"].)

On May 27, 2021, our high court rejected identical arguments in *Lemcke, supra*, 11 Cal.5th at pages 646, 669–670. The court determined that nothing in CALCRIM No. 315's instruction on witness certainty operates to lower the prosecution's burden of proof, nor does the instruction state the jury *must* presume an identification is accurate if the eyewitness has expressed certainty. (*Id.* at p. 656.) The court explained the instruction lists the witness's level of certainty as merely one of 15 factors the jury should consider when evaluating the credibility and accuracy of eyewitness testimony; the jury is left to decide whether the witness expressed a credible claim of certainty and what weight is to be placed on that factor, if any. (*Id.* at p. 657.)

---

**8** Because we consider the merits of defendants' instructional error claim, we decline to consider their alternate contention that trial counsel were ineffective for failing to object to the certainty factor language in CALCRIM No. 315. Even assuming their counsel's performance was deficient, as we explain *post*, defendants suffered no resulting prejudice. (See *People v. Mai* (2013) 57 Cal.4th 986, 1009 [noting in addition to showing counsel's performance was deficient, a defendant "must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different"].)

The court also rejected the defendant's argument the certainty instruction denied him a meaningful opportunity to present a complete defense. (*Lemcke*, *supra*, 11 Cal.5th at p. 660)  The defendant was permitted to put on a vigorous defense on the issue of identity; he called an eyewitness identification expert who testified at length about the weak correlation between certainty and accuracy, particularly with respect to in-court identifications. (*Ibid.*)  The defendant had the opportunity to cross-examine the eyewitness and the investigating officers regarding that identification and the procedures used during photographic lineups. (*Ibid.*)

The court concluded that in the context of the instructions as a whole and the trial record, listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating an eyewitness identification did not render the defendant's trial fundamentally unfair or otherwise amount to a due process violation. (*Lemcke*, *supra*, 11 Cal.5th at p. 661.)

Here, like *Lemcke*, the certainty factor contained in CALCRIM No. 315 was presented in a neutral manner—it did not equate the certainty of a witness's identification with its accuracy, and the certainty factor was one of 15 different factors offered for the jury's consideration.  The instruction did not advise the jurors what weight to ascribe to any of the witnesses' statements of confidence in their identifications of Brown and/or Thomas.

Further, additional instructions the jury received undercut any contention the certainty language lowered the burden of proof.  The trial court here directed the jury to presume Brown and Thomas were innocent, and that the prosecution had the burden of proving all elements of the crime beyond a reasonable doubt.  The instruction on eyewitness identification itself reiterated the requirement with respect to Brown's and Thomas's identity:  "The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime.  If the People have not met this burden, you must find the defendant not guilty."

Also, like *Lemcke*, the instruction did not deny defendants a meaningful opportunity to present a defense. They had opportunity to cross-examine Jennifer, Shawna, and S.L., pointing out to the jury some of the weaknesses in their identifications. Defense counsel was also able to highlight some of the problematic aspects of the identification procedures, such as the fact only one person was shown to the witnesses to identify. Both defense counsel argued in closing argument that the witnesses were unable to make any in-court identification of either defendant.

Considering the trial record here, there is no basis to distinguish this case from *Lemcke* or any of our high court's earlier cases that endorsed the use of instructions that direct the jury to consider an eyewitness's level of certainty when evaluating identification evidence. (See *Sanchez*, *supra*, 63 Cal.4th at p. 461 [rejecting claim challenging similar certainty language in CALJIC No. 2.92, the predecessor of CALCRIM No. 315]; *People v. Johnson* (1992) 3 Cal.4th 1183, 1230 [rejecting claim the trial court erred when it refused to strike witness certainty factor set forth in CALJIC No. 2.92]; *People v. Wright*, *supra*, 45 Cal.3d at pp. 1141–1143 [approving CALJIC No. 2.92].) Our high court's decisions control. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) The certainty instruction did not deprive defendants of due process or the ability to present their defense.

We also discern no prejudice. Beside any expressions of certainty by the witnesses, there were several other factors that tended to support the reliability of the witnesses' identifications. By all accounts, the lighting in the courtyard that night was fairly good—one of the officers at the scene testified that in the available lighting he was able to recognize faces at a distance of 40 feet; the suspects were apprehended minutes after the shooting and their clothing and physical characteristics matched the witnesses' descriptions; and the witnesses were able to make the identifications within hours of the event.

61.

Additionally, the eyewitness identifications were far from the only evidence connecting defendants to the crime. McGee testified she brought both defendants to Ashwood and they were both out of the car at the time she heard gunshots. They left Ashwood immediately after the shooting and were stopped by police minutes later. Both defendants had GSR on their hands, and while the GSR on Brown was a low-level sample, the gloves found in the back of the car where he was sitting had a significant amount of GSR. The gun that definitively fired the lethal bullet was found a few hundred feet from the car in which Brown and Thomas were riding. While emphasizing the identifications made by the witnesses, the prosecutor never pointed to the witnesses' *certainty* of those identifications as a basis to credit them. Giving the instruction was harmless beyond doubt. (See *Sanchez*, *supra*, 63 Cal.4th at pp. 462–463 [no error and no prejudice in instructing on witness certainty].)

Although *Lemcke* held the certainty factor instruction did not result in any federal constitutional violation in that case—as we similarly conclude here—our high court nonetheless concluded that the form of CALCRIM No. 315 has the potential to mislead jurors. (*Lemcke*, *supra*, 11 Cal.5th at p. 665.) In the exercise of its supervisory powers, the court directed trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point. (*Lemcke*, *supra*, at pp. 661, 668–669.)

In supplemental briefing, Brown and Thomas construe *Lemcke*'s directive to be a new supervisory power rule premised on the erroneousness of instructing on the certainty factor, which should be applied retroactively to nonfinal cases.[9] Yet, even assuming we

---

[9] Defendants argue *Lemcke* overruled *People v. Johnson*, *supra*, 3 Cal.4th at pages 1231–1232 and *Sanchez*, *supra*, 63 Cal.4th at pages 461–462 to the extent those cases held the certainty-factor portion of the witness identification instruction was proper. They contend this new rule should be given retroactive application, relying on *People v. Coleman* (1975) 13 Cal.3d 867, 889 (probationer's testimony from a probation revocation hearing held prior to the disposition of related criminal charges inadmissible in prosecutor's case-in-chief; new exclusionary rule to be given prospective application), *People v. Brigham* (1979) 25 Cal.3d 283,

62.

agreed with this characterization of *Lemcke* and its asserted retroactive application, any error in instructing on the certainty factor was harmless in this case for the reasons already discussed above.

### C.    Instruction on Defendant's Statement Alone (CALCRIM No. 359)

Brown argues the court's instruction under CALCRIM No. 359 violated his due process rights.

#### 1.    Background

Brown made out-of-court statements that were part of the prosecution's case. Specifically, McGee testified about what she overheard Brown saying during a phone call while she was in the car with him.  Two of the witnesses at the apartment building testified that prior to the shooting they heard Brown saying "'[y]ou got any trees?'" and something like "'[d]o you have them on you?'" or "'[a]re you holding?'"[10]  Jennifer testified she heard these questions being asked in the direction of the hooded man—he had walked out of her line of sight before she heard these questions being asked.

Without objection, the trial court instructed the jury pursuant to CALCRIM No. 359:

> "The defendant may not be convicted of any crime based on his out-of-court statements alone.  You may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime was committed.

> "That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.

---

292 and footnote 15 (disapproving supplemental reasonable doubt instruction under inherent supervisory powers and expressly providing that holding should have retroactive application to nonfinal cases), and *People v. Engelman* (2002) 28 Cal.4th 436, 445–449 (finding no instructional error, but concluding deliberation instruction had the potential to mislead the jury and, in the exercise of supervisory power, directing that the instruction not be given in future trials).

[10]    Jennifer testified she heard these questions asked in the direction of the hooded man—he had walked out of her line of sight before she heard these questions being asked.

"The identity of the person who committed the crime may be proved by the defendant's statements alone.

"You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

### 2. Analysis

Brown now contends this instruction was erroneous because it allowed the jury to infer Brown committed the killing based on his out-of-court statements alone, thus violating his constitutional rights to due process and to a jury determination of guilt beyond a reasonable doubt.

The People correctly assert that Brown failed to object to the challenged instruction. As such, the claim is forfeited on appeal. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 906.) However, even assuming the failure to object did not forfeit the issue (§ 1259), the claim lacks merit.

In reviewing the claim that the given instruction lowered the standard of proof, we consider whether there is a reasonable likelihood the jury misapplied the instruction. (*Victor v. Nebraska* (1994) 511 U.S. 1, 6.) We do not view the challenged instruction in isolation, but consider it in the context of the instructions as a whole. (*People v. Moore* (2011) 51 Cal.4th 1104, 1140.)

In a criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—the fact of loss, injury or harm caused by a criminal act. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169.) The corpus delicti rule is this: the prosecution must establish the corpus delicti *independent* from the defendant's admissions, ensuring that the defendant does not admit to a crime that did not occur. (*Id.* at p. 1169.) The independent proof may be circumstantial and is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also possible. (*Ibid.*) The amount of independent proof of a crime can be slight or minimal. The prosecution need make only a prima facie showing permitting the reasonable inference that a crime was committed. Once the necessary showing of independent evidence is met, the defendant's

64.

extrajudicial statements may be considered by the jury to strengthen the case on all issues.  (*People v. Jones* (1998) 17 Cal.4th 279, 301–302.)

The identity of the defendant as the perpetrator of the crime, however, is not part of the corpus delicti.  Identity may be established by the defendant's words alone.  (*People v. Frye* (1998) 18 Cal.4th 894, 960, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.)  When a defendant's statements form part of the prosecution's case, the trial court must instruct sua sponte that a finding of guilt cannot be predicated on the statements alone.  (*People v. Alvarez*, *supra*, 27 Cal.4th at p. 1170.)  The corpus delicti rule is defined in the CALCRIM No. 359 instruction and its predecessor, CALJIC No. 2.72.  (*People v. Rosales* (2014) 222 Cal.App.4th 1254, 1258–1259 (*Rosales*).)

In *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1427 (*Rivas*), the Sixth District Court of Appeal concluded the first two paragraphs of the version of CALCRIM No. 359 given in this case correctly stated the corpus delicti rule, but found the instruction confusing with regard to the third paragraph about the declarant's identity:  "[T]he reference to identity in CALCRIM No. 359 presents a risk of confounding the jury by telling jurors that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime—and yet those statements, again taken alone, are entertainable to prove the defendant's 'identity [as] the person who committed the crime' …, which to any juror can only mean the defendant's identity as the perpetrator, i.e., the guilty party.  The instruction requires reconsideration."  (*Rivas*, *supra*, at p. 1429, fn. omitted.)[11]

---

[11]     The third paragraph of CALCRIM No. 359 was modified in light of the decision in *Rivas*, *supra*, 214 Cal.App.4th at pages 1427–1429.  The pattern instruction's third paragraph now states as follows:  "This requirement of other evidence does not apply to proving the identity of the person who committed the crime [and the degree of the crime].  If other evidence shows that the charged crime [or a lesser included offense] was committed, the identity of the person who committed it [and the degree of the crime] may be proved by the defendant's statement[s] alone."  (CALCRIM No. 359.)

*Rivas* acknowledged that in *People v. Foster* (2010) 50 Cal.4th 1301 (*Foster*) the California Supreme Court upheld CALJIC No. 2.72—the predecessor corpus delicti instruction. (*Rivas*, *supra*, 214 Cal.App.4th at p. 1429, fn. 8.) But, *Rivas* distinguished *Foster* and noted the wording of CALJIC No. 2.72 differed in that it properly explained that identity was not an element of the crime, whereas CALCRIM No. 359 did not. (*Rivas*, *supra*, at pp. 1429–1430 & fn. 8.)

A year later, the Second District Court of Appeal disagreed with *Rivas*'s conclusion. In *Rosales*, the court found the third paragraph of CALCRIM No. 359 was not confusing: "It is … well established that a defendant's inculpatory out-of-court statements *may* … be relied upon to establish his or her entity as the perpetrator of a crime. [Citations.] This is because the perpetrator's identity is not part of the corpus delicti. [Citations.] [¶] CALCRIM No. 359, like CALJIC No. 2.72, clearly so states. The corpus delicti rule is stated in the first two paragraphs of CALCRIM No. 359. The law concerning proof of identity by a defendant's extrajudicial statements is correctly stated in the third paragraph. There is no danger a jury will be unable to separate the two rules any more than in CALJIC No. 2[.]27 which has been approved by our Supreme Court .… As noted, CALJIC No. 2.72 states in part: 'The identity of the person who is alleged to have committed a crime is not an element of the crime [nor is the degree of the crime]. The identity [or degree of the crime] may be established by [a][an] [confession] [or] [admission].' CALCRIM No. 359 states with greater precision and economy of language, 'The identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone.' CALCRIM No. 359 correctly states the law. [Citations.] There was no reasonable likelihood the jury was confused and misapplied the instruction. Finally, CALCRIM No. 359 reminds the jury that the accused may not be convicted unless the prosecution proves guilt beyond a reasonable doubt. CALJIC No. 2.72, which was approved by our Supreme Court in

*Foster*, [*supra*, 50 Cal.4th at p. 1301], contains no such reminder." (*Rosales*, *supra*, 222 Cal.App.4th at pp. 1260–1261; see *People v. Reyes* (2007) 151 Cal.App.4th 1491, 1498.)

We find *Rosales* persuasive. The instruction properly stated the corpus delicti rule and the law, and the challenged third paragraph merely informed the jury that, in contrast with the commission of a crime, the identity of the defendant may be proved by defendant's statements alone. Immediately following that sentence, the jury was instructed, "You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt." The jury was so instructed on more than one occasion. We do not agree with defendants that the corpus delicti instruction was confusing. There is no reasonable likelihood the jury construed the corpus delicti instruction in a manner that violated defendants' rights, and we need not reach their prejudice argument. (*People v. Rogers* (2006) 39 Cal.4th 826, 872.)

## IV.    Cumulative Error

Defendants claim the cumulative effect of the asserted errors, even if harmless individually, was prejudicial and deprived them of their federal due process right to a fair trial.

"'Under the cumulative error doctrine, the reviewing court must "review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to [the] defendant in their absence."'" (*People v. Mireles* (2018) 21 Cal.App.5th 237, 249.) The touchstone test for cumulative error is whether the defendant received due process and a fair trial. (*Ibid.*) When the cumulative effect of errors deprives the defendant of a fair trial and due process, reversal is required. (See *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

"'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) The combined effects of multiple errors

may indeed render a trial fundamentally unfair. (See *People v. Cuccia*, *supra*, 97 Cal.App.4th at p. 795 [several errors led to fundamentally unfair trial].)

We have assumed two evidentiary errors, neither of which were independently prejudicial: the admission of Hall's testimony about what S.L. told her about seeing a man in a white T-shirt in the courtyard the night of the shooting, and the admission of McGee's text messages with a friend.

As explained above, both Hall's testimony and McGee's text were duplicative of S.L.'s and McGee's properly admitted testimony. Moreover, neither the challenged portion of Hall's testimony nor McGee's text message bolstered the credibility of either S.L.'s or McGee's trial testimony in any meaningful way. These two assumed errors were harmless individually, and remained so even when considered together. Defendants were entitled to a fair trial, not a perfect one. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057.)

## V. Joint and Several Liability for Restitution

Pursuant to section 1202.4, subdivision (f)(2), the trial court ordered both Brown and Thomas to pay $4,985.14 in direct restitution to the victim's family. The court did not expressly make Brown and Thomas jointly and severally liable, nor do the abstracts of judgment indicate joint and several liability as to the restitution amount. Defendants request the court modify the judgment to reflect Brown and Thomas are jointly and severally liable for the direct restitution order.

The People maintain Brown and Thomas forfeited this claim by failing to object at the time of sentencing, and there is no requirement that the trial court make the obligation joint and several. Defendants argue a reviewing court may reach nonevidentiary claims even in the absence of an objection, and defendants maintain the restitution order constitutes an unauthorized sentence that can be corrected at any time.

68.

We exercise our discretion to reach this issue. (*People v. Young* (2017) 17 Cal.App.5th 451, 463 [fact that a party may forfeit a right to present a claim does not mean the appellate court is deprived of authority to reach the merits of the issue].)

"Victim restitution is mandatory under the California Constitution. Article I, section 28, subdivision (b), to the California Constitution provides in pertinent part: '(A) It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer. [¶] (B) Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss.' (Cal. Const., art. I, § 28, subd. (b)(13)(A)-(B).) For the purposes of victim restitution under our Constitution, the parents of the direct crime victim are separate victims. (Cal. Const., art. I, § 28, subd. (e); see also … § 1202.4, subd. (k)(3)(A).)" (*People v. Nichols* (2017) 8 Cal.App.5th 330, 341.)

A victim's restitution right is to be broadly and liberally construed (*People v. Taylor* (2011) 197 Cal.App.4th 757, 761), and on appeal restitution awards are reviewed for an abuse of discretion (*People v. Giordano* (2007) 42 Cal.4th 644, 663). "[T]he court's discretion in setting the amount of restitution is broad, and it may use any rational method of fixing the amount of restitution as long as it is reasonably calculated to make the victim whole." (*People v. Baker* (2005) 126 Cal.App.4th 463, 470.)

California courts have held that section 1202.4, subdivision (f), authorizes the sentencing court to order codefendants convicted of the same offense to pay direct victim restitution fines jointly and severally. (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535; *People v. Madrana* (1997) 55 Cal.App.4th 1044, 1049, 1051–1052.) A restitution order is intended to compensate the victim for the actual loss, but it is not intended to provide the victim with recovery greater than that amount. (*People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1172; *People v. Fortune* (2005) 129 Cal.App.4th 790, 795–796;

see § 1202.4, subd. (f) [court shall require defendant make restitution to victim *in an amount based on the amount of loss claimed by the victim* or any other showing made to the court].)

One way for trial courts to hold multiple defendants accountable to pay this restitution and simultaneously avoid a double recovery by a victim is to explicitly impose a joint and several obligation on each defendant convicted of the crime at issue.  (*People v. Leon* (2004) 124 Cal.App.4th 620, 622 ["a court may impose liability on each defendant to pay the full amount of the economic loss, as long as the victim does not obtain a double recovery"].)

We agree with defendants that if the specific restitution amount ordered in this particular case is not made joint and several, the funeral expenses may potentially be paid twice—once by Brown and once by Thomas, since both carry the full amount of the funeral expenses as their respective victim restitution obligation.  To avoid a double recovery, we will modify the judgment to provide that the direct victim restitution obligation is joint and several.

## VI.    The Abstracts of Judgment Must Be Amended

### A.    Brown's Abstract of Judgment

The People note Brown's abstract of judgment indicating the amount of restitution is incorrect by one penny ($4,985.15) and should be amended to reflect the amount the court ordered during its oral pronouncement ($4,985.14).  The People are correct, and the abstract shall be amended to provide the correct amount of restitution ordered.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [oral pronouncement of judgment controls].)

### B.    Thomas's Abstracts of Judgment

As to Thomas, the court issued a determinate sentence abstract of judgment on Judicial Council Forms, form CR-290, which documents the one-year enhancement imposed by the trial court under section 12022.5(a)(1).  The court also issued an indeterminate abstract of judgment on Judicial Council Forms, form CR-292 to document

70.

the indeterminate life term imposed on Thomas for conviction under section 187. Both abstracts of judgment list the fines and fees imposed by the court.

Thomas argues that including the fines and fees on both abstracts of judgment could lead to double collection. The People agree and request that the determinate abstract of judgment, Judicial Council Forms, form CR-290, be stricken, and that the indeterminate abstract of judgment, Judicial Council Forms, form CR-292, be amended to reflect the one-year firearm enhancement.

We concur. Since the abstracts of judgment together may have the effect of doubling the fines and fees ordered by the court, they diverge from the oral pronouncement of judgment and must be amended. (*People v. Mitchell*, *supra*, 26 Cal.4th at p. 185.) As to Thomas, the determinate abstract of judgment recorded on Judicial Council Forms, form CR-290 shall be stricken, and the indeterminate abstract of judgment recorded on Judicial Council Forms, form CR-292 shall be amended to reflect the one-year firearm enhancement imposed by the trial court.

## DISPOSITION

The judgment is modified to reflect that the obligation of each defendant to pay victim restitution under section 1202.4, subdivision (f)(2), in the amount of $4,985.14, is joint and several. The clerk of the trial court is directed to amend defendants' abstracts of judgment accordingly. The clerk of the trial court is further directed to (1) amend Brown's abstract of judgment to state the correct amount of restitution ordered; and (2) amend Thomas's indeterminate abstract of judgment to include the one-year enhancement imposed under section 12022.5(a)(1). The determinate abstract of

71.

judgment as to Thomas is stricken. The amended abstracts of judgment shall be submitted to the appropriate authorities. The judgment is otherwise affirmed.

                                                   MEEHAN, J.

WE CONCUR:

DETJEN, Acting P. J.

SMITH, J.